**ATLANTA BILTMORE HOTEL CORPORATION**
and
**Bennie T. Hanson, Petitioners,**
v.
**COMMISSIONER OF INTERNAL REVENUE, Respondent.**
No. 21508.

United States Court of Appeals
Fifth Circuit.
July 23, 1965.

Harold E. Abrams, Atlanta, Ga., M. E. Kilpatrick, Atlanta, Ga., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., of counsel, for petitioners.

Donald W. Williamson, Jr., Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Attys. Dept. of Justice, Sheldon S. Cohen, Chief Counsel, I. R. S., Glen E. Hardy, Atty., I. R. S., Washington, D. C., for respondent.

Before MOORE * and BELL, Circuit Judges, and SLOAN, District Judge.

MOORE, Circuit Judge.

By petitions, the taxpayers, Atlanta Biltmore Hotel Corporation (the Biltmore) and Mrs. Bennie T. Hanson (Mrs. Hanson) seek to review a decision of the Tax Court sustaining tax deficiencies against the Biltmore and Mrs. Hanson for the years 1954, 1955 and 1956. Because of a loss carryback to 1956 from 1959 which was substantially reduced by the Tax Court's decision, 1959 is also involved.

The Biltmore may be characterized as a family corporation. The Tax Court said: "The general impression one receives from all of Mrs. Hanson's testimony is that she considered the hotel corporation hers, and that its funds were her funds or at least available to her for her use for her personal convenience and that of her family." The hotel and apartment house were constructed and opened for operations in 1924 by William Candler, Sr., who invested some $6 million dollars in the project and who until his death in 1936 was the President of the company. He was the husband of the now Mrs. Hanson. Mrs. Hanson succeeded her late husband as president. The holders of the common stock during the years in question were William Candler, Jr., Mrs. Hanson's son, 260 shares; Mrs. Chambers, Mrs. Hanson's daughter, 260 shares; Mrs. Hanson, 3,256 shares; Callan Court Company, 3,656 shares (the common stock of this company was owned 50% by Mrs. Hanson, and 25% each by her son and daughter); and others, 68 shares. A large convention hall with parking facilities was added in 1951.

In its income tax returns for 1954, 1955, 1956 and 1959, the Biltmore claimed depreciation deductions on the hotel

---

* Of the Second Circuit, sitting by designation.

based on a remaining useful life of 20½, 19½, 18½ and 15½ years, respectively, as of January 1st of such years. These figures in turn were based upon a 50-year useful period commencing in 1924. The Commissioner accepted these claimed deductions. Even when the Biltmore filed its petition in September 1961, it did not claim any other or different deduction rate. Not until it amended the petition in April 1963 did it claim that the hotel's remaining useful life was only seven years from January 1, 1956. The Commissioner countered by alleging a useful life of 30, 29, 28 and 25 years from the tax years in question.

Originally a thirty-five year useful life had been claimed for the adjoining convention hall built in 1951. The September 1961 petition asserted that this figure should have been 23½ years from 1951. The April 1963 amendment reduced the remaining period to seven years from January 1, 1956, a period co-terminous with the claim as to the hotel.

The items in issue on this appeal are the Commissioner's disallowances of

(1) A rent-free apartment occupied by Mrs. Hanson (the entire ninth floor) consisting of four bedrooms, four baths, two dens, two living rooms and two kitchens (one of which had been converted into an office for Mrs. Hanson).

(2) Meals furnished to Mrs. Hanson, her sister, her son and daughter and various friends and relatives.

(3) A maid and chauffeur for Mrs. Hanson.

(4) Shrubbery furnished at, and yard work performed on, the property of Mrs. Hanson and her daughter, Mrs. Chambers.

All of these items were paid for by, and charged as an expense of, the Biltmore. They were not regarded as income by the beneficiaries thereof and no income tax was paid by them on the value of these benefits to them.

(5) Large cash withdrawals by Mrs. Hanson from the Biltmore on open account, which Mrs. Hanson contends were loans.

(6) Extraordinary hotel obsolescence allegedly caused by the advent of motels.

## I. Lodging and Meals

Section 119, Int.Rev.Code of 1954, permits the exclusion from an employee's gross income of the value of meals or lodging furnished by the employer "for the convenience of the employer, but only if—

"(1) in the case of meals, the meals are furnished on the business premises of the employer, or

"(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment." Treasury Regulation, § 1.119–1 (1956) merely expands the language of the statute.

■ The key phrase as to lodging is "for the convenience of the employer" and "as a condition of his employment"; as to meals it is only "convenience". Putting aside the question of whether Mrs. Hanson was an employee of a family corporation which she regarded as "hers", the facts are convincing that the value of the apartment cannot be excluded from her gross income or taken as a Biltmore operating expense. Certainly the duties performed by her first husband, as president when they lived away from the hotel in their home on the northeast side of Atlanta could have been no less managerial between 1924 and 1936 than performed by Mrs. Hanson thereafter. At the times in question, the hotel had over 400 employees; a vice-president and general manager, D. O. Beusse, who appears to have been well able to carry on his duties for some 38 years in the daytime and still maintain a home of his own; three shifts of personnel each headed by an assistant manager; a purchasing agent; a sales manager; an operations manager; a building superintendent; engineering, maintenance, food service, kitchen, laundry and housekeeping staffs, all combined to run the hotel. Mrs. Hanson, as president

at a salary of $30,000 a year, naturally took an interest in the welfare of the hotel and did perform certain duties particularly in endeavoring to promote the use and reputation of the hotel. However, there is no adequate proof whatsoever that her services were so unique that she had to have a $6,600 a year apartment rent-free (and to her, tax-free) or that the Biltmore was entitled to deduct the apartment as an operating expense.

During the three tax years, Mrs. Hanson and Mrs. Chambers primarily, and her son to a minor extent, received meals from the hotel of a value of approximately $10,000 a year. To obtain free meals is undoubtedly a "convenience" to the recipient but this is not the intent nor the wording of the statute. Mrs. Chambers had no specific duties and no office in the hotel.[1] Mrs. Hanson presented no proof which would justify a conclusion differing from that as to lodging. Mr. Candler, Jr., lived on his ranch in Florida, and visited the hotel infrequently, although he regularly received reports as to its financial condition.

## II. The Maid and Chauffeur

Since Mrs. Hanson was not entitled to rent-free lodging at the expense of the hotel, neither was she entitled to the services of a personal maid and chauffeur. As Mrs. Hanson testified, the maid had served her all of Mrs. Hanson's life and before her residence in the hotel. The evidence clearly established that the butler-chauffeur served Mrs. Hanson, who had not driven a car since 1936. Occasional services rendered by them to Mrs. Hanson which related to the hotel, such as answering the telephone or driving guests around the city, were wholly incidental and would not qualify maid or butler-chauffeur as hotel employees.

## III. Shrubbery

This item which was the basis for the assessment of the 50% fraud penalty so far exceeded the bounds of propriety that further comment is unnecessary. The least that can be said is that Mrs. Hanson did indeed treat the corporation and its assets as "hers".

## IV. The Alleged Loans

The Tax Court held that large amounts of money withdrawn by Mrs. Hanson from the Biltmore during 1954, 1955 and 1956 and carried on the books in an open account were, in fact, distributions in the nature of dividends and not "loans" as claimed by Mrs. Hanson. The facts clearly sustain the Tax Court. In 1954, 1955 and 1956, the increases in cash withdrawals by Mrs. Hanson were $14,077.25, $27,223.00 and $28,201.75, respectively. Mrs. Hanson executed no note, agreement or other document which might indicate a loan; no security was given and no interest was charged. The artificial procedure indulged in militates against the "loan" theory. At the end of the year, Mrs. Hanson would borrow from a bank funds to repay the "loan" but straightway after the turn of the year would withdraw money from the Biltmore and repay the true bank loan. That the advances were ultimately paid off in 1959 does not change the character of the transaction because payment was not made until over a year after a revenue agent had commenced his hotel audit.

## V. Obsolescence

The applicable law is found in section 167, Int.Rev.Code of 1954, in Treasury Regulations §§ 1.167(a)–1, (a)–9, (b)–0 (1956), and in this circuit in Southeastern Bldg. Corp. v. Commissioner of Internal Revenue, 148 F.2d 879 (5th Cir.), cert. denied, 326 U.S. 740, 66 S.Ct. 52, 90 L.Ed. 442 (1945). In Regulation § 1–167(a)–9, a taxpayer is given the privilege of showing that the original estimated useful life "should be shortened by reason of obsolescence greater than had been assumed * * *." But the burden, this court has held, 148 F.2d at 880, rests squarely upon the taxpayer to prove that the useful life of the property has, in fact, been shortened and that

---

1. From 1955 she was ill, and did not participate in any hotel activity.

"deduction for depreciation which covers the ordinary wear and tear will not be sufficient to restore the cost of the property before its usefulness is at an end."

■■ The Biltmore bases its obsolescence claim primarily upon the advent of the motel or motor hotel. Fundamentally, this taxpayer confuses obsolescence with competition. This court takes judicial notice of the fact that during the period at least from the mid-1950s, many motels have come into being, first on the periphery of large metropolitan areas and, more recently, in the centers of many of our cities. However, during this same period, new hotels have been constructed and others modernized. The older hotel may well suffer somewhat from the competition of the new but in any thriving and growing city, such as Atlanta, the need for accommodation is ever on the increase.

Not a single fact has been adduced by the Biltmore which would entitle it to extraordinary obsolescence. The hotel property has been well maintained. During 1952 and 1956, some $450,000 was spent on air conditioning. In 1957, $250,000 went into renovation of the tenth floor and in 1959 a $100,000 swimming pool was installed. The convention hall constructed in 1951 provides convention facilities for some 2,000 persons.

The Biltmore's obsolescence claim is so grossly overstated as to be self-defeating. When it filed its 1954, 1955 and 1956 returns, it envisaged no economic stormclouds on the horizon to justify the assertion of its claim. In fact, gross room receipts increased during these years as did gross receipts.[2] Even in September 1961 with full benefit of hindsight, no claim of extraordinary obsolescence was asserted in its Tax Court petition. Not until April 1963 did the Biltmore assert that the hotel building had become "completely obsolete at the end of 1962." However, management did not contemplate closing the hotel. In fact, during the trial (April 1963), Mrs. Hanson herself testified that she did not consider the hotel obsolete and that she intended to continue to operate the business during her lifetime. Naturally in any business, competition must be expected. The Dinkler-Plaza, a hotel in downtown Atlanta, had added 132 rooms in 1956, scarcely an indication that hotels were rapidly dying institutions. The percentages of hotel occupancy are bound to vary from year to year. Profits will fluctuate accordingly.[3] The economic analyses and prognostications of the Biltmore experts in the field of hotel valuation present interesting theoretical opinions. However, theories must yield to actual facts which, in this case, refute the theories.

The decisions on which the Biltmore relies are subject to the same criticism. In the Southeastern Bldg. Corp. case, supra, this court said with respect to a warehouse building which could be used

2. See brief for Respondent, p. 7, where the gross room receipts and gross receipts of the hotel are set forth in the report of the hotel auditors for the following years:

| Year | Total Gross Room Receipts | Total Gross Receipts |
|------|---------------------------|----------------------|
| 1954 | $1,116,743.80 | $2,410,259.29 |
| 1955 | 1,169,125.45 | 2,412,362.48 |
| 1956 | 1,291,264.24 | 2,590,805.63 |

3. Price range of certain common stocks of corporations operating hotels, 1956–1963:

| | |
|---|---|
| Hilton Hotels Corp. | 43–3/8—15 |
| Sheraton Corp. | 24–1/4— 7–3/8 |
| Hotel Corp. of America | 9–5/8— 2–1/4 |
| Knott Hotels Corp. | 27 —15–1/4 |

Source: Moody's Bank and Finance Manuals.

for many years, although at a lesser rental, "[t]he unprofitable nature of a business or the mere shrinkage in value of commodities is not a sufficient basis upon which to predicate an allowance for obsolescence". 148 F.2d at 880. A far more drastic economic situation is revealed in Detroit & Windsor Ferry Co. v. Woodworth, 115 F.2d 795 (6th Cir. 1940), cert. denied, 312 U.S. 692, 61 S.Ct. 712, 85 L.Ed. 1128 (1941). There, a profitable ferry company was subjected to both bridge and tunnel competition. The ferries continued to run, although from 1931 to 1937 at a substantial loss. No effort had been made to discontinue the service or liquidate the company. Obsolescence was disallowed, the court saying, "[m]ere diminution in value while the assets are still used is not a proper basis for obsolescence deduction." 115 F.2d at 798. To the same effect, see State Line & Sullivan R.R. v. Phillips, 98 F.2d 651, 120 A.L.R. 441 (3d Cir.), cert. denied, 305 U.S. 635, 59 S.Ct. 103 83 L.Ed. 408 (1938); Becker v. Anheuser-Busch, Inc., 120 F.2d 403 (8th Cir.), cert. denied, 314 U.S. 625, 62 S.Ct. 105, 86 L.Ed. 105 (1941); Radio Station WBIR, Inc., 31 T.C. 803, 807 (1959). For a discussion of allowable obsolescence due to frustration and abandonment of a project, see Keller Street Dev. Co. v. Commissioner of Internal Revenue, 323 F.2d 166 (9th Cir. 1963).

## VI. The Convention Hall

■ The original depreciation period of 35 years for the convention hall from 1951 would end in 1986; the 50 years for the hotel in 1974. The hall and the hotel are virtually a single unit. The Beusse testimony that he could not imagine "anything that it [the convention hall] could be operated for except in conjunction with the hotel" seems to have been an accurate appraisal of the situation. Accordingly, depreciation should have been calculated on the basis of a useful life for the convention hall until 1974.

Except for the modification of the depreciation rate for the convention hall, the opinion of the Tax Court is affirmed.