JOSEPH S. PIEKOS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DOLORES F. PIEKOS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Piekos v. Commissioner
Docket Nos. 13007-80, 13008-80.
United States Tax Court
T.C. Memo 1982-602; 1982 Tax Ct. Memo LEXIS 140; 44 T.C.M. (CCH) 1401; T.C.M. (RIA) 82602; October 18, 1982. Arthur N. Nasser, for the petitioners. Lawrence C. Letkewicz, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioners' 1976 income tax of $27,111.60, and an addition to tax of $13,555.80 for civil fraud under section 6653(b). [1] After concessions by both parties, two issues remain for our decision: (1) whether payments made by petitioner-husband's *141 50 percent-owned corporation for part of the construction costs of petitioners' personal residence constitute bona fide loans from the corporation or taxable income to petitioners; and (2) whether any part of the underpayment of tax for 1976 was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Joseph S. Piekos and Dolores F. Piekos resided in Bloomingdale, Illinois, when they filed their petitions in these consolidated cases. [2] Petitioners timely filed a joint U.S. Individual Income Tax Return (Form 1040) for the taxable year 1976 with the Internal Revenue Service Center at Kansas City, Missouri. References to petitioner in the singular will be to Joseph S. Piekos, and where reference to the wife is necessary, she will be referred to as "Dolores." *142 During the years 1976, 1977, and 1978, petitioner was a 50 percent shareholder, a director, and the president of Mid-States Rigging, Inc. (Mid-States). During the years 1976 and 1977, and at least up to May 1978, Edgar Engler (Engler) was also a 50 percent shareholder, a director, and the secretary-treasurer of Mid-States. Mid-States was engaged in the business of moving heavy equipment and machinery, and petitioner and Engler were the only full-time employees of Mid-States. Mid-States maintained its corporate books and records and filed its Federal income tax returns on a fiscal year ending on the last day of February. Mid-States maintained a cash receipts and disbursements journal that recorded all corporate expenditures. Mid-States' books were kept at its business offices in Chicago. Both petitioner and Engler had equal and unrestricted access to Mid-States' books. Both petitioner and Engler were authorized to sign checks drawn on mid-States' account at the Western National Bank, Cicero, Illinois. Both petitioner and Engler wrote checks and made entries in the cash disbursements journal, although petitioner was primarily responsible for the day-to-day book-keeping. *143 On February 20, 1976, Dolores acquired title to a lot located at 143 Raven Lane in Bloomingdale, Illinois. Petitioner had negotiated to purchase that lot for a period of time prior to February 20, 1976. On March 9, 1976, Dolores applies for a permit from the Village of Bloomingdale to construct a single family residence and the permit was granted on March 15, 1976. The residence in Bloomingdale was completed in August of 1976. Petitioner acted as the general contractor for the construction of the residence. Sometime in March or April of 1976, petitioner told Engler that he was going to use some of Mid-States' funds to pay some of the costs of building his new residence, and Engler consented to this use of corporate funds. Petitioner agreed to render a full accounting to Engler. It is unclear whether this agreement was reached before or after petitioner began construction of his new residence, or before or after petitioner told his subcontractors and suppliers to send their bills to Mid-States' offices. At the time of this agreement, petitioner and Engler did not agree upon, nor even discuss, terms such as duration of the "loan," interest rate, security, or a repayment schedule. *144 Nor did they set a maximum limit on the corporation's payments on petitioner's behalf; petitioner was limited only to the extent of Mid-States' assets -- "He couldn't borrow more than what we [Mid-States] had." Petitioner had the contractors and suppliers send their invoices to Mid-States' business offices in Chicago. Most of the invoice contained internal indications, such as addresses and the like, that they were for costs and labor on a job at 143 Raven Lane. A couple of the invoices identified that address as petitioner's personal residence. Between April 23 and July 28, 1976, petitioner signed checks drawn on Mid-States' account to subcontractors and suppliers for services and supplies rendered in the construction of his residence. In addition to writing these checks, petitioner accounted for each payment in Mid-States' cash disbursements journal under the various classifications used to record the corporation's own business expenses. After returns, the net payments made by Mid-States for petitioner's benefit totaled $26,717.05. The schedule of payments and the classifications under which petitioner listed the disbursements in Mid-States' cash disbursements journal *145 are as follows: Check
Date
Payable to
Amount
Classification
1737
4-23-76
Industrial Steel
$ 297.07
Job Cost
1821
5-18-76
Paul Travelstead
156.00
Job Cost
1822
5-18-76
John Downes
187.00
Job Cost and Materials
1823
5-18-76
Components, Inc.
345.98
Job Cost and Materials
1882
5-27-76
Augustine
Construction
3,375.00
Job Cost Subcontractor
1900
6-02-76
Rockwood Co.
175.00
Insurance
1909
6-03-76
Don Conforti
Plumbing
2,460.00
Subcontractors
2077
6-21-76
Bartels Company
1,594.00
Job Cost and Supplies
2101
6-22-76
Augustine
Construction
1,395.00
Job Expense
2203
6-25-76
G.C. Kranz Heating
& Cooling, Inc.
3,500.00
Repairs and Service
2204
6-25-76
G.C. Kranz Heating
& Cooling, Inc.
100.00
Repairs and Service
2211
6-30-76
John Mullin Masonry
3,875.00
Subcontractor
2225
7-07-76
Augustine
Construction
4,559.00
Subcontractor
2256
7-12-76
G.M.A. Electric
2,490.00
Subcontractor
2286
7-28-76
Pli-O-Seal
483.00
Office Decorating
2287
7-28-76
Barnes Excavating
2,325.00
Job Expense
TOTAL AMOUNT RECEIVED
$27,317.05
LESS AMOUNT RETURNED
600.00
NET AMOUNT RECEIVED
$26,717.05
*146 Petitioner knew at the time he issued these checks that the payments were for his own personal expenses and that they did not represent deductible business expenses of Mid-States. In accounting for these payments in Mid-States' cash disbursements journal under various categories of corporate expenditures, such as "job cost," "materials," "subcontractor," "insurance," and "office decorating," petitioner did not make any marks or otherwise indicate in the journal that the checks were payments of his own personal expenses and should therefore be reclassified at some later date. Petitioner did not set up a loan account on the corporate books for the Mid-States' funds disbursed for his personal benefit, nor did he ask anyone whether he should set up such an account. [3] Petitioner did keep a "tally" of payments made by Mid-States for construction costs on his home which he submitted to Engler sometime after completion of the residence. This accounting showed a net of $26,717.05 paid by Mid-States on petitioner's behalf. *147 Petitioner also classified Mid-States' checks for corporate expenses (checks other than those issued to the subcontractors and suppliers on his personal residence) as subcontractor, job cost, or job expense in Mid-States' cash disbursements journal for the months of March through July of 1976. After subtracting the $26,717 paid on behalf of petitioner, the total amount paid by Mid-States for corporate job costs or job expense during its taxable year ended February 28, 1977, and before making adjusting journal entries, was $13,231.38. At the time Engler agreed to let petitioner use corporate funds to pay construction costs on his house, petitioner and Engler agreed that Engler would receive a distribution of cash from Mid-States in an amount equal to the payments made on petitioner's behalf for the construction costs of his house. Petitioner signed a check drawn on Mid-States' account dated February 26, 1977, to Ed Engler for $26,717, minus a deduction for FICA of $731.25. [4] This represented Engler's "loan" from Mid-States, to balance the distributions by Mid-States on petitioner's behalf. Petitioner entered the check to Engler on Mid-States' payroll sheets. Engler had no *148 need to borrow money from Mid-States and the payment was merely to equalize his position with petitioner's. Sometime after the close of Mid-States' fiscal year of February 28, 1977, petitioner and Engler signed unsecured promissory notes dated March 1, 1977, each in the amount of $26,717, each bearing interest of six percent per annum, and each payable in 115 monthly installments, unless sooner paid. Those notes were executed well after March 1, 1977, possibly as late as September 1977. [5]Mid-States accrued no interest on these "loans" until at least March 1, 1977. Likewise, petitioner paid no interest attributable to any period before March 1, 1977. *149 Mid-States employed Samuel Dikelsky (Dikelsky) as bookkeeper and account during the years 1975 through 1978. Dikelskly spent one or two days a month at Mid-States' offices doing the accounting and bookkeeping work for the corporation. He totalled or "footed" the corporation's books of original entry. In addition, Dikelsky prepared balance sheets, work sheets, statements of income and expense, profit and loss work sheets, and adjusting journal entries for the fiscal years ended on February 28, 1977, and February 28, 1978. Dikelsky had access to all Mid-States' records, including the cash disbursements journal, and all invoices. Dikelsky did not become aware of Mid-States' payments on behalf of petitioner until sometime after the close of the fiscal year on February 28, 1977. [6] Dikelsky only learned about the payments when petitioner told him about them and showed him the "tally" he had prepared. Dikelsky first reclassified the payments as additional salary to petitioner. Dikelsky advised petitioner that, in his opinion, the payments were salary income to him. When petitioner first informed Dikelsky that Mid-States' funds had been used to pay construction costs on his residence, *150 he did not provide Dikelsky with the original or copy of the promissory note signed by him and dated March 1, 1977. See Footnote 5 above. During June or July of 1977, the Internal Revenue Service began an audit of Mid-States for some year or years prior to the year ended February 28, 1977. On September 9, 1977, Dikelsky attended a meeting in the offices of Arthur Nasser, counsel for Mid-States, but the record does not disclose what transpired at that meeting. After that meeting, Dikelsky made adjusting journal entries reclassifying the payments on petitioner's behalf and the payments to Engler as loans rather than salary. [7] Before making this reclassification, Dikelsky was shown the notes and repayment schedules. Mid-States' Corporate Income Tax Return (Form 1120) for the fiscal year ending February 28, 1977, was dated September 12, 1977, and was filed with the Internal Revenue Service *151 on September 14, 1977. Petitioner signed for Mid-States, and Dikelsky signed the return as the preparer. [8]
A document dated March 1, 1977, purportedly *152 the minutes of a meeting of the board of directors of Mid-States, increased the weekly salaries of petitioner and Engler from $500 to $750, and approved the "loans" to petitioner and Engler. Mid-States' payroll ledgers showed that petitioner and Engler each received a weekly salary of $500 during each of the years 1976, 1977, and 1978. Federal withholding, FICA, and state withholding for both petitioner and Engler were calculated on the $500 weekly salary figure. Adjusting journal entries accounted for the $250 weekly salary increases that were applied against the "loans" to petitioner and Engler. This authorization increasing the salaries to petitioner and Engler, and approving the "loans," occurred well after March 1, 1977, possibly as late as September 1977. See Footnotes 5 and 7 above. At the close of Mid-States' taxable year ending February 28, 1978, both petitioner and Engler were credited with additional salary in an amount sufficient to pay off the balance of their "loans." This second salary increase was not formally authorized by the board of directors. [9]
*153 Petitioner reported salary income from Mid-States on his calendar year 1977 Federal income tax return in the amount of $37,650. Of this amount, $10,000 represented the increased salary that was applied directly against the principal and interest due on the "loan" obligation to Mid-States. Petitioner reported salary income from Mid-States on his calendar year 1978 Federal income tax return in the amount of $53,814. Of this amount, $19,914.86 was applied directly against the principal and interest due on his "loan" obligation to Mid-States. He also deducted interest paid on his "loan" from the corporation in both years. On its corporate income tax returns for its taxable years ending February 28, 1977 and February 28, 1978, Mid-States deducted as compensation those increased salary amounts. [10]
Petitioner did not report as income in his calendar year return *154 for the year 1976 any of the payments made by Mid-States on his behalf in 1976 for construction costs on his home. In his notice of deficiency, respondent determined that the corporate payments on petitioner's behalf constituted taxable income to him. [11] In addition, respondent determined that part of the underpayment for 1976 was due to fraud and therefore determined an addition to tax under section 6653(b). OPINION The first issue we must decide is whether payments made by Mid-States on petitioner's behalf constitute bona fide corporate loans. Petitioner was a 50 percent shareholder and an officer and director of Mid-States. Mid-States paid over $27,000 on petitioner's behalf to subcontractors and supplier for the new home petitioner was constructing. Petitioner argues that these corporate payments represent loans by Mid-States to him. Respondent *155 argues that these distributions on petitioner's behalf constitute taxable income to him. Whether corporate payments to or on behalf of a shareholder constitute bona fide loans or taxable income is a question of fact that turns upon the intent of the parties. The parties must have intended the transaction as a loan, which requires both an intention upon the part of the taxpayer-shareholder to repay and a corresponding intention on the corporation's part to enforce the obligation. This intent must have existed at the time the payments were made. Pierce v. Commissioner,61 T.C. 424 (1974); Haber v. Commissioner,52 T.C. 255 (1969), affd. per curiam 422 F. 2d 198 (5th Cir. 1970). Petitioner has the burden of proving that the payments were intended to be loans to him. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). While there is no fixed rule for distinguishing income from loans, some general criteria are available to guide *156 us in ascertaining the intentions of the parties at the time they entered into the transaction. See, e.g. Williams v. Commissioner,627 F. 2d 1032 (10th Cir. 1980), affg. a Memorandum Opinion of this Court; Berthold v. Commissioner,404 F. 2d 119, 112 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism's Estate v. Commissioner,322 F. 2d 956 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Dean v. Commissioner,57 T.C. 32, 43 (1971). [12] See generally, Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.05 (3d ed. 1971). We look beyond statements of subjective intent to objective factors such as the extent of stockholder control, the corporation's dividend history, the magnitude of the payments, the presence or absence of conventional indicia of debt (note, interest, security, repayment schedule, etc.), the treatment of the transaction in the corporate financial statements and records, the formal authorization by the corporation, the actual payment of interest, and the ultimate payment of the "obligation." No single factor is determinative. See Alterman Foods, Inc. v. United States,222 Ct. Cl. 218, 611 F. 2d 866, 869 (1979). *157 [13] Of course, the self-serving testimony of the interested taxpayer that he intended a loan is in no way determinative. Fisher v. Commissioner,54 T.C. 905 (1970). Furthermore, payments by a closely-held corporation require special and careful scrutiny; control and lack of adverse interest between taxpayers and their corporation require that we look beyond the mere form and self-serving testimony so that we may perceive the true nature of the transaction. Wilkof v. Commissioner,636 F. 2d 1139 (6th Cir. 1981), affg. per curiam a Memorandum Opinion of this Court; Haber v. Commissioner,supra;Roschuni v. Commissioner,29 T.C. 1193, 1202 (1958), affd. 271 F. 2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960); Baird v. Commissioner,25 T.C. 387, 393 (1955). *158 Although petitioner here owned only 50 percent of the stock, Engler's passive acquiescence in petitioner's use of corporate funds warrants the same careful scrutiny here. There is no precise formula for weighing and balancing the various factors which we consider in resolving this factual issue. Each case must be decided upon its own facts. After reviewing the evidence in this record, we are convinced the payments made by Mid-States on petitioner's behalf in 1976 were not bona fide loans. Accordingly, we hold for respondent on this issue. Several factors contribute to our holding. First, we note how petitioner accounted for this transaction on Mid-States' books. Petitioner did not, at the time of the transactions, create a loan account in the corporation's cash journal nor did he inquire whether he should do so. Indeed, petitioner recorded the various disbursements in various corporate expense accounts as if they were legitimate expenditures for corporate purposes. There was nothing in the cash journal that would in any way indicate that payments had ever been made on petitioner's behalf. The fact that petitioner kept a separate tally of the payments may have some bearing *159 on the fraud issue, see p. 27, infra, but it does not diminish the significance of the initial failure to account for the transaction as a loan. While proper accounting does not per se establish a transaction as a loan, the absence of a proper accounting and other contemporaneous written records indicates that the transaction was not a loan. Dean v. Commissioner,supra;Berthold v. Commissioner,supra.[14]
Second, we observe the absence of traditional indicia of a loan at the time the parties entered into the transaction. Even viewing the evidence most favorably to petitioner, there was a seven to ten month gap between the payments and the documentary evidence of debt. Petitioner and Engler testified that they agreed to petitioner's use of corporate funds for construction cost of his home sometime in March or April 23 and July 28 of that year. Even assuming that the promissory notes were executed and the board of directors meeting was held on March 1, 1977, which *160 we do not believe and do not find, this gap seriously weakens any evidentiary value which the documents might otherwise provide. Even giving petitioner the fullest benefit of doubt, petitioner's "loan" from Mid-States was evidenced by nothing but his oral agreement with Engler until at least March 1, 1977. Nothing in the evidence of that oral agreement indicates terms such as interest, security, or time for repayment. Furthermore, although the note dated March 1 provided for interest, interest ran only from March 1, 1977. Petitioner had free use of the corporate funds from the time the payments were made in 1976 until at least March 1 of the following year. Finally, the only limit on petitioner's withdrawals was a practical one--the extent of the corporation's assets. As Engler testified, "He couldn't borrow more than what we had." The failure of petitioner and Engler to set a ceiling on petitioner's withdrawals weights against finding a bona fide corporate loan. Third, we note that the evidentiary value of the March 1, 1977 documents is further diminished by our finding that they were not in fact executed on that date. Indeed, most of the evidence suggests that these documents *161 were not executed until at least September of 1977. Many factors justify this inference, including: (1) the fact that Dikelsky did not make his adjusting entries reclassifying the payments as a loan until after the September 9, 1977 meeting with the corporation's counsel; (2) the facts that the salary increase, purportedly authorized March 1, 1977 to pay the "loan" purportedly ratified on that date, was not reflected in the payroll ledgers, and indeed, was accounted for only by adjusting entries made in the books at the close of the taxable years; and (3) the fact that Dikelsky did not make the adjusting entries reclassifying the transaction as a loan until after he saw the note. We accord these documents even less weight because of the warranted suspicion that they were executed after, and in response to, the commencement of an IRS audit of Mid-States' return for some earlier fiscal year. The evidentiary value of loan documents, payments and the like, is substantially diminished when they occur in response to an IRS audit. Tollefsen v. Commissioner,52 T.C. 671, 680 (1969), *162 affd. 431 F. 2d 511 (2d Cir. 1970), cert. denied 401 U.S. 908 (1971); Atlanta Biltmore Hotel Corp. v. Commissioner,349 F. 2d 677, 680 (5th Cir. 1965), affg. on this issue a Memorandum Opinion of this Court; Baird v. Commissioner,supra.[15] Execution in September of 1977 or later would place the documents well after the commencement of the IRS audit in the summer of that year. Dikelsky could not state whether he was first told of the transaction before or after the IRS audit. Neither petitioner nor Engler was able to pin point the date when they so informed Dikelsky, except that it occurred of necessity after the close of the fiscal year on February 28, 1977. Accordingly, we attach little weight to the purported notes and authorizing resolution evidenced by the minutes of the board of directors meeting. Fourth, the purported loans were made in proportion to petitioner's and Engler's respective stock holdings. Pro rata distributions to or on behalf of shareholders tend to evidence taxable income (in the form of dividends) rather *163 than bona fide loans, Harber v. Commissioner,supra, particularly where, as here, pro rata distributions were intended from the outset. This is further buttressed by Engler's own testimony that he had no need for a loan and that the distribution to him was simply to keep things even between him and petitioner. Furthermore, Engler's "loan" was part of the same planned transaction, and petitioner withheld FICA taxes from Engler's "loan" and recorded it in the payroll ledger as salary to Engler. These factors also strongly indicate that the transaction was not a bona fide loan. Petitioner's strongest argument in favor of treating the transaction as a bona fide loan is that the purported loan obligation was in fact repaid, with interest. Repayment is often a highly persuasive factor, [16] but it too is only one factor to be considered and it is not conclusive. Mellon v. Commissioner,36 B.T.A. 977, 1060-1061 (1937). [17] Any weight we might accord to this "repayment" by petitioner is substantially diminished by the timing and manner in which it was effected. First, *164 we entertain a suspicion, as with the loan documents above, that the repayment plan was generated in response to an audit by the IRS. Furthermore, irrespective of the IRS audit, the manner in which the repayment was effected is itself suspicious. The repayment was made by increasing petitioner's "salary" to repay the "loan." This increase in salary was purportedly authorized by the board of directors on March 1, 1977, but, as noted above, actually occurred later, probably in September of 1977. Mid-States' payroll ledgers recorded only the old salary, not the new salary. The new salary was accounted for only by an adjusting entry in the books. Treatment of a transaction in a corporation's books is in no way conclusive but is a factor to consider. Doyle v. Mitchell Bros. Co.,247 U.S. 179, 187 (1918); Dean v. Commissioner,57 T.C. 32, 44 (1971); Chism Ice Cream Co. v. Commissioner,T.C. Memo. 1962-6, affd. sub nom. Chism's Estate v. Commissioner,322 F. 2d 956 (9th Cir. 1963). The fact that petitioner reported this *165 increased salary on his tax returns and paid taxes on this increased salary amount is somewhat probative. However, in light of the timing of his actions and the other conflicting evidence, that fact is not sufficient to carry his burden of proof. Treatment of the purported salary increase in subsequent years was merely consistent with petitioner's whole course of conduct that began after the close of the fiscal year ended February 28, 1977 and probably in response to the IRS audit of Mid-States. Accordingly, we find that petitioner has failed to carry his burden of proof to establish that these payments on his behalf were bona fide corporate loans. We find for respondent *166 on this issue and hold that the payments are taxable income to petitioner in 1976. It is not clear whether we are called upon to decide whether the corporate payments were salary of dividends. The issue as framed by both parties in their pleadings and at trial was whether the payments were loans or "taxable income," not whether the taxable income was salary or dividends. The first mention of "dividends" came in respondent's opening brief. Normally we do not consider issues raised for the first time on brief. Aero Rental v. Commissioner,64 T.C. 331 (1975). [18] However, we do not accept petitioner's assertion in his reply brief that the issue is whether the payments were loans or "compensation." Respondent's notice of deficiency stated that the payments were "taxable income," not "salary" or "compensation." Indeed, in his opening statement at trial, petitioner's counsel stated the issue as whether the payments were loans or "taxable income," not whether they were loans or salary.
*167 Moreover, the description in the statutory notice of the disallowed item can fairly be read as describing a constructive dividend. [19] Indeed, were we called upon to decide the issue, we would be hard pressed to characterize these pro rata payments to the two shareholders as anything other than constructive dividends. There is no credible evidence in the record to suggest that the payments were for services rendered to the corporation. In any event, the parties have not clarified for the Court why a characterization need be made in this case. The distinction between salary or compensation, on the one hand, or dividends, on the other hand, could be important if petitioner were claiming the benefits of section 1348. That is because the maximum tax under section 1348 applies only to "earned income." In his recomputation of petitioner's tax liability in the notice of deficiency, *168 respondent applied the higher marginal rates of section 1 rather than the 50 percent maximum rate imposed by section 1348. If petitioner intended to claim the benefits of section 1348, he should have done so in his petition. "Any issue not raised in the assignment of errors shall be deemed to be conceded." Rule 34(b)(4). See also Rule 34(b)(3); Rule 34(a)(1). Here, however, petitioner had claimed income averaging on his 1976 return, and a taxpayer cannot have the benefits of both income averaging and the maximum tax. See section 1304(b)(4), as it read in 1976. However, it does not appear that respondent gave petitioner the benefit of income averaging in the statutory notice, and the parties may be able to attend to this matter in the computation under Rule 155 without the necessity of reopening the record. [20]
*169 Since we hold that the payments by Mid-States constitute income to petitioner in 1976 that he did not report, we now must address the fraud issue. Section 6653(b)[21] provides for a 50 percent addition to tax if any part of an underpayment of tax is due to fraud. The burden of proving fraud is upon respondent, a burden he must carry by clear and convincing evidence. Sec. 7454(a); Stone v. Commissioner,56 T.C. 213, 220 (1971); Rule 142(b). The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Wilson v. Commissioner,76 T.C. 623, 634 (1981); Candela v. United States,635 F. 2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941). [22] Fraud is a factual question *170 to be determined on the basis of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention, and therefore petitioner's entire course of conduct can be relied upon to establish such fraudulent intent by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Stone v. Commissioner,supra at 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. *171 In his answer to the petition in this case, respondent alleged as evidence of fraud all of petitioner's various understatements of income and underpayments of tax for the year 1976. [23] Except for the issue of the corporate distributions which we have held to be income to petitioner, all of the other items were settled by the parties before trial. See Footnote 11 above. Since respondent introduced no evidence on these points on trial, we shall not consider them in ruling on the fraud issue. Based on all the facts in this case, we conclude that respondent has not established fraud by clear and convincing evidence. As primary evidence of petitioner's alleged fraud, respondent points to petitioner's accounting in Mid-States' books for the corporate distributions made to pay construction costs on his home. Petitioner recorded these expenses as if they were legitimate corporate expenditures. He did not give any indication in the books that they were for his own personal benefit. Furthermore, *172 these same corporate accounts also included proper corporate expenditures, a factor that might serve to hide the personal payments recorded in those accounts. Respondent correctly notes that this Court has often referred to conduct calculated to mislead or conceal as a prime indication of fraud. See Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Beaver v. Commissioner,55 T.C. 85, 93 (1970). We agree that petitioner's treatment of these payments on the corporate books is some evidence of fraud. However, poor bookkeeping alone is not sufficient to establish fraud by the requisite clear and convincing evidence. Furthermore, the fact that petitioner kept a separate tally of the corporate payments reduces somewhat the significance of his failure to account properly for the payments. If he had really intended to cover up the payments, we do not believe that he would have kept a separate written record of them, except perhaps to account to Engler so that Engler too could *173 take a like amount out of corporate funds. The record in this case reeks of suspicion. The Court found petitioner evasive and less than forthright in his testimony about the original agreement with the other stockholder, his treatment on the corporation's books of the purported loans from his corporation, and the facts and circumstances under which these purported loans came to light. There is a strong suspicion that the whole transaction came to light only after the IRS began an audit of the corporation. However, the Court did not wholly discount petitioner's story because the other stockholder testified unequivocally that petitioner asked his permission to use corporate funds to build his house and that he (Engler) agreed to that. While Engler too seemed evasive and less than candid on other matters, he was clear on that point. Moreover, mere suspicion does not prove fraud, and the fact that we do not find petitioner's testimony wholly credible is not sufficient to establish fraud. Cirillo v. Commissioner,314 F. 2d 478, 482 (3d Cir. 1963), affg. in part and reversing in part a Memorandum Opinion of this Court; Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), *174 affd. 252 F. 2d 681 (6th Cir. 1958); see also DeClercq v. Commissioner,T.C. Memo. 1982-386. Respondent cites as further evidence of petitioner's alleged fraud the fact that his accountant, Dikelsky, advised him that the payments were income to him. Dikelsky gave petitioner this advice when Dikelsky first became aware of the payments, but that occurred substantially after the close of the corporation's taxable year of February 28, 1977. In fact, from the record it appears likely that it did not take place until sometime after the commencement of the IRS audit in the middle of the summer of 1977. Petitioner's income tax return for 1976 was timely filed and is dated April 12, 1977. It is difficult to see how advice from his accountant that payments constituted income, advice that the taxpayer received after he had already filed his income tax return for the year in question, constitutes evidence of fraud. Furthermore, the record is not clear whether Dikelsky advised petitioner that the payments were income to him in 1976 or 1977. In fact Dikelsky himself appeared to believe that the payments were income in 1977, not 1976. It is also difficult *175 to see how an accountant's advice to a taxpayer that certain payments constitute taxable income in 1977 prove that the taxpayer's failure to report such amounts as income in 1976 was fraudulent. We conclude that respondent has failed to carry his burden of proving by clear and convincing evidence that part of the underpayment of tax for 1976 was due to fraud. To reflect the foregoing and the concessions of the parties, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year 1976, and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. Joseph S. Piekos is petitioner in docket No. 13007-80. Dolores F. Piekos is petitioner in docket No. 13008-80. Dolores originally claimed protection in her separate petition as an innocent spouse under section 6013(e), but waived that issue at trial.↩
3. In explaining why he had posted the disbursements for his house as Mid-States' business expenses rather than in a "loan" account, petitioner testified "That was the only way I knew of how to post it (sic)." We do not find his explanation credible.↩
4. Petitioner could not explain why he withheld FICA taxes on Engler's "loan." We note that an entry was made on Engler's payroll records, in normal date sequence, reflecting this payment as salary. A similar entry was made on petitioner's payroll records, but out of proper date sequence, reflecting the $26,717 as salary to petitioner and a like amount of FICA, $731.25, for petitioner.↩
5. While the notes are dated March 1, 1977, there was no testimony that in fact they were executed on that date. Although the date shown in the notes may evidence the date of execution, it is not determinative. From other evidence, we find that the notes were executed well after March 1, 1977. First, Dikelsky, Mid-States' accountant and bookkeeper, was not shown the notes when he first became aware of the disbursements (which event itself occurred sometime after February 28, 1977). When Dikelsky first became aware of the payments for petitioner's home and the equalizing payment to Engler, the accountant initially classified those expenditures as additional salary to the two shareholder-officers. Dikelsky later reclassified the payments from salary to loans only after seeing the notes. If the notes had been executed on March 1, there is no reason in the record why they were not shown to Dikelsky, and no explanation in the record why Dikelsy waited until September to reclassify the payments as loans. See n. 7, infra.↩ Second, the payroll ledger only accounts for petitioner's old salary of $500 rather than the new salary of $750 which was purportedly approved the same time Mid-States approved the loans (as evidenced by the minutes of a meeting ostensibly on March 1, 1977). If the meeting had taken place on March 1, 1977 approving the loan and salary raises, the payroll sheets should have recorded the new salary ($750) rather than the old one ($500). This indicates that the raises, and the notes, were not made until sometime later, and the fact that the salary increases to pay the loans were accounted for only as adjusting entries indicates that the notes and raises date much later than March 1, 1977, and possibly as late as September 1977. Although adjusting entries to the corporation's books were made in September, the payroll ledgers for petitioner and for Engler never reflected the purported salary increase from $500 to $750, in either 1977 or 1978.
6. Other than the fact that it occurred after February 28, 1977, Dikelsky could not remember exactly when petitioner told him about the advances. Indeed, Dikelsky could not even remember whether he was so informed before or after the IRS audit of Mid-States that began in the summer of 1977.↩
7. Petitioner argues that there is no evidence that this adjusting entry was made after the September 9 meeting, but the stipulated joint exhibit indicates otherwise. Dikelsky's work sheet lists adjusting entries 1 through 19. It then states, "Per instructions from Mr. Nasser & Arthur Samet (legal counsel for company) office visit 9/9/77." This statement is directly above adjusting entries Nos. 20-23, and it is No. 21 that changes the disbursements for petitioner's benefit from salary to a loan. We accept that entry as evidence that Dikelsky made the adjusting entry after the September 9 meeting. We are also satisfied that Dikelsky made the entry before September 12, since Mid-States' income tax return for fiscal year ended February 28, 1977, dated September 12, 1977 and filed September 14, 1977, reflects loans to stockholders in an amount of $53,434, the total payments for both petitioner and Engler. ↩
8. Dikelsky prepared petitioner's individual tax returns for 1977 and 1978, but he did not prepare petitioner's 1976 return.↩
9. While petitioner testified that he was the board of directors, apparently meaning that no formal authorization was necessary, his testimony is contradicted by the parties' stipulation that Engler served as a director until atleast↩ May of 1978 and by the payroll records that show that Engler was still with Mid-States until at least May 18, 1978.
10. Because of the different time frame of petitioner's calendar yeawr return and the corporation's fiscal year return, the amounts are not exactly the same. Mid-States' returns also reported interest income, but the record does not disclose whether such amounts represented any of the "interest" paid by petitioner.↩
11. Respondent also determined that petitioner had failed to report other items of income, including rental income from Mid-States, reimbursed business expenses from Mid-States, and unreported interest. Those issues are not before the Court, having been settled by the parties by their separate stipulation of settled issues.↩
12. See also Johnson v. Commissioner,T.C Memo. 1979-7, affd. 652 F. 2d 615↩ (6th Cir. 1981). 13. See also Hardy v. Commissioner,T.C. Memo. 1982-225↩, on appeal (9th Cir. Sept. 1, 1982).
14. See also Smith v. Commissioner,T.C. Memo. 1980-15↩.
15. See also Granzotto v. Commissioner,T.C. Memo. 1971-106↩.
16. See Ravano v. Commissioner,T.C. Memo. 1967-170; Went-worth v. Commissioner,T.C. Memo. 1966-167. Cf. Baird v. Commissioner,25 T.C. 387↩ (1955). 17. See also Atlanta Biltmore Hotel Corp. v. Commissioner,T.C. Memo. 1963-255, affd. on this issue, 349 F. 2d 677 (5th Cir. 1965); Fender Sales, Inc. v. Commissioner,T.C. Memo. 1963-119, rev'd. on another issue, 338 F. 2d 924↩ (9th Cir. 1964).
18. See also Wilson v. Commissioner,T.C. Memo. 1980-288; Astleford v. Commissioner,T.C. Memo. 1974-184↩.
19. In part, that description read: It is further determined that these disbursements were not reimbursements for any expenses you incurred by or on behalf of the corporation but were funds used by you for your personal benefit. Therefore, your taxable income for 1976 is increased by $26,717.05.↩
20. See Mannette v. Commissioner,69 T.C. 990, 995 (1978); Hosking v. Commissioner,62 T.C. 635 (1974); Pereira v. Commissioner,T.C. Memo. 1976-66 and particularly footnote 2. See also Combs v. United States,490 F. Supp. 19, 21↩ n. 1 (E.D. Ky. 1978).
21. Section 6653(b) provides: (b) Fraud.↩--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. 22. See also B.B. Rider Corp. v. Commissioner,T.C. Memo. 1982-98; Diehl v. Commissioner,T.C. Memo. 1982-23; Jackson v. Commissioner,T.C. Memo. 1981-252↩.
23. Respondent also alleged that petitioner had lied to respondent's agents and otherwise impeded the course of the audit. No evidence in support of those allegations was presented to the Court.↩