In the Matter of INDIAN LAKE ESTATES, INC., Bankrupt.

UNITED STATES of America, Appellant,

v.

Ernest L. STEWART, Trustee, Appellee.

No. 30960.

United States Court of Appeals, Fifth Circuit.

Sept. 14, 1971.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, Karl Schmeidler, Gary R. Allen, Attys., Tax Div., Dept. of Justice, Washington, D. C., John L. Briggs, U. S. Atty., Jacksonville, Fla., for appellant.

Don M. Stichter, Tampa, Fla., for appellee.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

An issue familiar to tax litigation—whether funds supplied to a business are, in substance, debt or equity—arises in an unusual context in the present appeal. The trustee of a bankrupt corporation challenges the validity of priority tax claims filed by the United States.[1] The challenged claims were based upon deficiency assessments by the Commissioner of Internal Revenue which disallowed corporate income tax deductions related to debenture bonds and discounted land purchase installment contracts. Finding that the record fails to rebut the presumably correct assessment of the Commissioner, we reverse.

As in every contest over whether a particular form of business financing is a loan or a contribution to capital, a detailed fact analysis is required, even though the facts here are not in dispute.

On January 12, 1955, Leon Ackerman incorporated El Dorado Estates, Inc. under the laws of the State of Florida. The only capital stock ever issued by the corporation was 1000 shares having a par value of one dollar per share. Ackerman acquired all of this stock and was the sole stockholder of record during the entire time pertinent to this controversy. On October 8, 1955 the name of the cor-

---

1. The present appeal relates entirely to the merits of the claims. In a prior appeal, In Re Indian Lake Estates, Inc., 428 F.2d 319 (5th Cir. 1970), this Court determined that the claims were not procedurally barred from a priority status as tax claims of the United States.

poration was changed to Indian Lake Estates, Inc. In that same month the corporation purchased a large tract of land near Lake Wales, Florida, under a contract which provided for an immediate payment of 35,000 dollars and a deferred balance of approximately 187,000 dollars. The land purchased was in an undeveloped rural area and required extensive and expensive development to make it resalable as subdivided community lots. The initial estimate of development costs exceeded 3,750,000 dollars and was later increased to almost 4,000,000 dollars. Aside from its 1,000 dollar capitalization, the only source of asset acquisition and development costs which Indian Lake Estates had at these times was the financial arrangements discussed below.

On November 14, 1955, Indian Lake Estates entered into an agreement with a joint venture which used the name Lake Wales Group. An introductory "whereas" paragraph in this agreement provided that it was understood by the parties " * * * that the *capital* to be used by [Indian Lake Estates] the Party of the Second Part, is necessary for the successful venture of the Party. * * * " Greatly simplified, the agreement provided that the joint venture would pay 100,000 dollars to Indian Lake Estates in exchange for: (1) a note in the principal sum of 50,000 dollars payable within two years and bearing interest from date at the rate of 4% per annum; and (2) noninterest-bearing debenture bonds having a face value of 500,000 dollars and a maturity date 25 years in the future. The repayment of the note and the retirement of the bonds were to be secured by a deposit of 10% of the corporation's gross receipts into a special bank account in a Washington, D. C. bank on which only the joint venture's agent could draw. No other bonds could be issued by the corporation without the consent of the Lake Wales Group joint venture. The corporation was also restricted in the sale or pledge of its land sales contracts, in that it had to receive consent therefor from the Lake Wales Group and the joint venture had the right of first refusal for the purchase of such contracts. Restrictions were placed on salaries payable to officers and a minimum sales price was set for lots. Ackerman, individually, was a party to the agreement, which bound him not to sell or pledge his stock and bound Indian Lake Estates not to issue or sell any additional stock without the written consent of the joint venture. Ackerman further assigned his stock to an escrow agent and gave that agent the right to vote the stock in the event of Ackerman's death or incapacitation, or upon a determination by the escrow agent that the *"investment"* of the joint venture was in any way jeopardized. Ackerman further agreed to restrict his land sales activities to Indian Lake Estates until 75% of all property owned by the corporation had been sold. Finally, it is to be noted that the agreement provided that if the corporation was liquidated after all lands had been sold, it would have no obligation to retire any outstanding bonds if the 10% payments from gross receipts had been made as provided.

On January 25, 1956, Indian Lake Estates entered into an agreement with Edward J. and Mary K. Edelen. Under the terms of this agreement the Edelens paid Indian Lake Estates the sum of 50,000 dollars and received therefor: (1) a noninterest-bearing note in the principal sum of 25,000 dollars payable in installments over a period of four and a half years; and (2) noninterest-bearing debenture bonds in the face value of 250,000 dollars, having a maturity date of 25 years from the date of issue, and being subordinate to the debenture bonds issued to the Lake Wales Group described above. The agreement between Indian Lake Estates, Ackerman and Mr. and Mrs. Edelen was substantially similar to the agreement with the Lake Wales Group. One of its "whereas" paragraphs described a desire on the part of Indian Lake Estates to induce the Edelens to *"invest"* a sum "to be used by the Party of the Second Part

[Indian Lake Estates] as *working capital* for the development and sale of the subdivision of land known as Indian Lake Estates." The Edelen agreement required a deposit of 2½% of total gross receipts and expressly acknowledged its subordinate position to the previous agreement with the Lake Wales Group. The Edelens received a right of refusal to purchase any land sale contracts of Indian Lake Estates which the Lake Wales Group did not purchase. Restrictions were placed upon stock transfers and officer salaries and Ackerman was restricted from engaging in all but certain designated land sales transactions.

By May 31, 1956 the 50,000 dollar promissory note issued to the Lake Wales Group had been paid in full. Between February 29, 1956 and December 31, 1959, Indian Lake Estates paid the Lake Wales Group a total of 800,000 dollars to redeem all of the debenture bonds held by this joint venture. The 25,000 dollar promissory note issued to Mr. and Mrs. Edelen was paid in full December 31, 1959. All debenture bonds issued to the Edelens were redeemed between July of 1956 and December 1959 by total payments to the Edelens of 234,752.54 dollars.

On October 10, 1958, Indian Lake Estates entered into an agreement with a joint venture designated as the Barmit Group. Under this agreement the Barmit Group paid 500,000 dollars to Indian Lake Estates in exchange for convertible debenture bonds having a maturity date five years from the date of issue, bearing interest at 9% per annum and providing for certain premiums on redemption so that the redemption price reached a total of 750,000 dollars. This agreement specifically provided that it was entered into with the understanding that Indian Lake Estates was acquiring the funds in order to provide itself with *"working capital"*. The agreement contained a number of restrictions, the most significant of which were a suspension of dividends during the redemption period and a transfer of all normal management functions to a finance committee consisting of corporate officers and representatives of the Barmit Group. One member of the Barmit Group had the equivalent of a veto power over this committee's decisions. Between the date of the agreement and December 17, 1959, Indian Lake Estates paid the Barmit Group a total of 653,500 dollars in compromise and satisfaction of all obligations on the outstanding bonds.

On 15 separate occasions between May 2, 1956 and April 24, 1959, Indian Lake Estates sold, at a discount, groups or "packages" of its land sales installment contracts. These discount sales were made to identities described only as Lake Groups—1st Lake Group, 2nd Lake Group, etc. The total discount deduction in question was in excess of 1,000,000 dollars. The basis of the Commissioner's original disallowance of the claimed deduction for these sales contract discounts was that such transactions took place between related taxpayers (a corporation and persons owning more than 50 percent of its equity capital). The trustee had the burden of demonstrating that this determination was in error. The record before the referee is almost wholly silent as to which individuals comprised the Lake Wales Group, or any but one of the fifteen Lake Groups. The only reference to the matter is the testimony of an accountant called by the trustee in bankruptcy who stated that most of the individuals comprising the Lake Wales Group, the Barmit Group and the 15 different Lake Groups were the same. In this state of the proof, we must assume that these joint ventures consisted of membership substantially identical to the membership of the Lake Wales Group. In addition to examining the instruments themselves and the deposition of a person experienced in the land development industry, the referee in bankruptcy heard testimony from an accountant employed by the trustee in bankruptcy and an Internal Revenue Agent who conducted the audit of the Indian Lake Estates returns involved.

Upon this record, the referee in bankruptcy reasoned that the transactions between Indian Lake Estates and the Lake Wales Group, the Edelens and the Barmit Group, respectively, were loan transactions which created a debtor-creditor relationship and could not properly be classified as capital or equity investments. He therefore concluded that the tax assessments upon which the government's claim was based were erroneous and arbitrary. Upon petition for review, the trial court adopted and affirmed the referee's opinion and order without independent reasoning.

The opinion of the referee fully explicated his determination of error in the Commissioner's decision. It discloses consideration of the following factors relative to the notes and debenture bonds: the instruments involved took the form of loan documents; some of these obligations bore interest; all of them had a fixed maturity or payment date; the obligation to repay was geared to gross sales and was not conditioned upon business success; the strict controls and rights granted by the agreements were consistent with high-risk lending and were inconsistent with an intention to assume an equity position; the parties advancing the financing did not subordinate their claims to common creditors but demanded a superior repayment position; and the bond or note holders never acquired stock in Indian Lake Estates, wherefore no "insider" dealings were involved. He also reasoned that although the corporation's "thin capitalization" weighed against his determination, it was of insufficient moment to control it.

With regard to the discounts on contract sales, the opinion held them to have been improperly disallowed because the auditing agent failed to give proper consideration to Indian Lake Estates, Inc. v. Special Investments, Inc., 154 So. 2d 883 (Fla.App.2d Dist.1963). In that case, after considering the full background of the dealings between Indian Lake Estates and the note and bondholding groups, the Florida appellate court construed the discount transactions to be sales of property rather than loans of money collateralized by assignments of the contracts involved. The referee also based this part of his holding upon his determinations that: Indian Lake Estates had no obligation to repurchase these contract sales; no member of the purchasing joint venture groups was ever a stockholder of Indian Lake Estates; and the transactions were the products of arm's length negotiations between a seller in desperate need of funds and a purchaser willing to risk money in an extremely speculative venture.

Based upon the uncontradicted evidence before us and the literal wording of the various underlying agreements between the parties, we are compelled to reject the ultimate conclusions and determinations of the referee as legally erroneous.

The law applicable to this appeal is well settled, though not easily applied. At the base of it all is the Supreme Court's determination that the decision as to whether funds furnished to a business venture are debt or equity depends upon the economic substance of the transactions between the parties and not upon the form in which any part or parts of the monetary advances happen to be cast. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed.2d 596, 97 A.L.R. 1355 (1935). Decisions in this Circuit have stressed thirteen factors which ought to have consideration. They are:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a maturity date;

(3) the source of the payments;

(4) the right to enforce the payment of principal and interest;

(5) participation in management;

(6) a status equal to or inferior to that of regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) payment of interest only out of "dividend" money;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the initial advances were used to acquire capital assets; and

(13) the failure of the debtor to pay on the due date or to seek a postponement.

*See* Montclair, Inc. v. Commissioner of Internal Revenue, 318 F.2d 38, 40 (5th Cir. 1963) and Tyler v. Tomlinson, 414 F.2d 844, 848 (5th Cir. 1969). These very same decisions have emphasized, however, that evidence which might tend to prove that a transaction was a contribution to capital could be of so many sorts that no comprehensive rule could be stated which would be applicable to all cases, and that the object of the inquiry is not to count the factors but to evaluate them.[2]

The mere fact that the agreements did not provide for the issuance of any document entitled "Share of Stock" pales into insignificance in the light of the fact that the agreements gave those advancing funds an even greater control over the corporation's sole stockholder than they would have received by simply becoming fellow stockholders, to wit, the right to limit his other land development activities. The various agreements unequivocally stated their intent to *invest* funds that would provide *working capital*. While working capital for established businesses can be generated by debt as well as equity funding, we know that for all practical purposes they provided the entirety of the invested capital for this new venture. The technical 1,000 dollar capitalization of Indian Lake Estates can be better characterized as illusory rather than thin. In total, it was only one thirty-fifth of the initial down-payment for the corporation's first asset. The economic substance of the transactions between Indian Lake Estates and the Lake Wales Group, and Mr. and Mrs. Edelen must certainly be recognized to be those of persons furnishing over 99 percent of the initial capitalization to a corporate venture in a mode designed to give them every indicia of stock ownership *plus* economic protections superior to that enjoyed by an ordinary stockholder.

The trustee urges us to consider that land development and promotion schemes of this sort are most frequently financed in the manner present here. What is common paractice in a particular segment of an industry or type of business may be another appropriate factor for consideration in a closer case, but it cannot control the application of broad principles of the nation's income tax laws. The fact that every land promotion in Florida or in an entire region of the nation may be financed in this note-bond-discount form does not mean that the substantial capitalization for that industry can be transformed into debt by stamping it in traditional debt molds.

The Barmit Group bond agreement presents a much closer case than either the Lake Wales Group or the Edelen financial arrangements. It did not require that a percentage of gross revenues be skimmed into a fund, nor did it finance a corporate entity as "thinly" capitalized as that underwritten by those original investors. However, we cannot overlook the fact that the Barmit Group was composed of most of the same investors who were, in October 1958, still firmly in control of the corporation's operations as members of the Lake Wales

---

2. Some other recent precedents of this Circuit which have dealt with the debt-equity problem are Dillin v. United States, 433 F.2d 1097 (5th Cir. 1970) [See particularly footnote 3, p. 1100.]; and Berkowitz v. United States, 411 F.2d 818 (5th Cir. 1969).

Group, through their stock escrow interests and restrictive covenants on salaries, dividends, lot sales prices and contract sale rights. In the Barmit Group bond agreement they exacted an even tighter measure of control over the day-to-day business management of the corporation through the requirement that an all-powerful finance committee be constituted and veto power over that committee be vested in them. Given the total circumstances present here, we view the scales as weighing their contributions more heavily as equity than debt.

We conclude the uncontradicted proof before the referee discloses that the trustee wholly failed to carry his burden of demonstrating error in the Commissioner's determinations that the financial input of the Lake Wales Group, Mr. and Mrs. Edelen and the Barmit Group was equity capital and not loans.

The determination that the Lake Wales Group were equity investors who owned more than 50 percent of the capital of the corporation means that the Commissioner correctly determined that the discount sales by Indian Lake Estates of its land purchase installment contracts to the same individuals were sales between a corporation and a controlling stockholder. Therefore, the expense of these discounts was not allowable under Section 267 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 267 (1967).[3] Thus, we do not need to reach the issue of the precedential effect of the Florida Appellate Court determination that these transactions were valid sales rather than security for loans. If it is pertinent that the Internal Revenue agent who audited Indian Lake Estates incorrectly interpreted this decision in making his audit, such error would be without consequence here. We therefore decline to express any further opinion on the matter.

The order of the district judge affirming the referee's disallowance of the claim of the United States is reversed and this cause is remanded to the district court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

3. In pertinent part, this section provides:
§ 267. LOSSES, expenses, and interest with respect to transactions between related taxpayers.
    (a) *Deductions disallowed.*—No deduction shall be allowed—
    (1) *Losses.*—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).
    \*     \*     \*     \*     \*
    (b) *Relationships.*—The persons referred to in subsection (a) are:
    \*     \*     \*     \*     \*
    (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;
    \*     \*     \*     \*     \*

    (c) *Constructive ownership of stock.*—For purposes of determining, in applying subsection (b), the ownership of stock—
    (1) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries;
    \*     \*     \*     \*     \*
    (3) An individual owning \* \* \* any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner;
    \*     \*     \*     \*     \*
In this connection it should be noted that Florida classifies a joint venture as creating a quasi-partnership relationship. See Conner v. Southland Corp., 240 So.2d 822 (Fla.App. 4th Dist.1970).