I.L. CONSTRUCTION, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent I.L. Constr., Inc. v. Commissioner
Docket Nos. 12765-85; 12766-85; 15860-85; 29055-85; 41424-85.
United States Tax Court
T.C. Memo 1989-199; 1989 Tax Ct. Memo LEXIS 199; 57 T.C.M. (CCH) 264; T.C.M. (RIA) 89199; April 27, 1989; As corrected May 2, 1989 Theodore F. Brill and William H. Karo, for the petitioners. Mitchell I. Horowitz, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in and additions to petitioners' *200 income tax as follows: Taxable
Corporate
year
[2] Additions to Tax Under Section Petitioner
Ended
Deficiency
6653(a)(1)
6653(b)
6653(b)(1)
I.L.
Construction,
Inc.
12-31-81
$ 79,374 - 0 - $ 39,687 - 0 - Independent
Lumber and
Plywood
Corporation
1-31-82
$ 34,072 - 0 - $ 17,036 - 0 - 1-31-83
$ 13,581 - 0 - - 0 -  * $ 6,791
Sincere
Investments,
Inc.
6-30-82
$ 62,228  ** $ 3,111
- 0 - - 0 - Individual
Taxable
Additions to Tax Under Section
Petitioners
Year
Deficiency
6653(b)
6653(b)(1)
Jorge E. Valdes
and Maritza Valdes
1981
$ 204,953
$ 102,377
- 0 - Ezequiel N. and
Maria Rodriguez
1981
$ 223,813
$ 111,907
- 0 - 1982
$ 14,944 - 0 - *** $ 7,472
*201 After concessions, the following issues remain to be decided: (1) whether the burden of going forward with the evidence should be shifted to respondent; (2) whether certain sums were taxable income to petitioners; (3) whether petitioners Maritza Valdes and Maria Rodriguez are innocent spouses, as defined in section 6013(e); (4) whether the statute of limitations bars the assessment and collection of the deficiency determined against Ezequiel N. and Maria Rodriguez for the taxable year 1981; and (5) whether the individual petitioners are liable for the additions to tax for fraud under section 6653(b) for the taxable year 1981. [3]
FINDINGS OF FACT The Rodriguezes
*202 Ezequiel N. Rodriguez ("Mr. Rodriguez") and Maria Rodriguez ("Mrs. Rodriguez") were residents of Miami, Florida, when they filed their petition in the instant case. Mr. and Mrs. Rodriguez ("the Rodriguezes") are married to each other. The Rodriguezes were born in Cuba and emigrated to the United States in 1969. At the time they came to the United States the Rodriguezes had one child and Mrs. Rodriguez worked in the home. Prior to the time the Rodriguezes emigrated to the United States, Mr. Rodriguez operated a clothing store in Cuba. Upon arriving in this country, Mr. Rodriguez began cleaning floors. He later superintended apartments in New York, and he held that job until the time the Rodriguezes moved to Miami. While in New York Mrs. Rodriguez earned some income at home by sewing for friends and making alterations for a charge. She worked approximately three hours during the day and three to four hours at night. Mrs. Rodriguez also cared for her sick sister. The Rodriguezes moved to Miami, Florida in August 1975. During 1976, the Rodriguezes purchased a personal residence in Miami. The purchase of their personal residence was financed, requiring the Rodriguezes to *203 execute an interest-bearing promissory note that called for monthly payments of principal and interest. The Rodriguezes were also required to sign a mortgage to secure that promissory note. The Rodriguezes have made all of the required monthly payments. In December 1975, Mr. Rodriguez bought a grocery store along with two partners. The grocery store was purchased by paying $ 10,000 in cash and financing the balance through the seller. The financing required monthly payments and carried an interest rate of 8 percent. Mr. Rodriguez worked in the grocery store seven days a week from 6:00 a.m. to 10:00 p.m., except for Sunday when he worked only until 3:00 p.m. Mr. Rodriguez had no time to engage in any other business activity other than the operation of the grocery store. Mrs. Rodriguez objected to her husband's work hours and quarreled with him because she wanted him to spend more time at home with the children. During the time that the Rodriguezes lived in Miami, the Rodriguezes' two children and Mrs. Rodriguez' mother, father, and uncle lived with the Rodriguezes. After Mrs. Rodriguez' daughter married, her daughter, son-in-law, and grandchildren also lived with the Rodriguezes. *204 Mr. Rodriguez sold the grocery store in 1980, at the urging of Mrs. Rodriguez. Independent Lumber
Independent Lumber and Plywood Corporation ("Independent Lumber") had its principal place of business in Miami, Florida, when it filed its petition in the instant case. Ramon Milian-Rodriguez ("Milian") is a convicted moneylaunder who was an agent of Cambios Monetarios Internacional, S.A. ("Cambios"). [4] Milian is unrelated to Mr. Rodriguez. Milian and Mr. Rodriguez had conversations during which Mr. Rodriguez learned that Milian had an accounting office and had connections with foreign companies. Milian formed a company known as Independent Lumber on behalf of Rafael Rodriguez (apparently unrelated to Mr. Rodriguez) and Armando Diaz for the purpose of engaging in the exportation of lumber from the United States to Venezuela. Mr. Rodriguez became involved with Independent Lumber along with Pablo Flores, who had been acquainted with Mr. Rodriguez for approximately two years. Pablo Flores had been in the business *205 of exporting lumber in Cuba. During 1981 Pablo Flores was associated with another company known as "J.P." that also exported lumber. Aramando Diaz was the president of J.P. On January 22, 1981, Mr. Rodriguez became President, Secretary, Treasurer, and sole Director of Independent Lumber and acquired all of its outstanding shares of stock. The business plans for Independent Lumber involved the sale of lumber in Venezuela and Mexico to clients of J.P. that could not be served by J.P. The plan also called for sales to suppliers that were contacts of Armando Diaz and Pablo Flores and sales to suppliers to be found by Mr. Rodriguez. Independent Lumber purchased supplies of lumber in Ecuador from GeorgiaPacific Lumber Company. The lumber was pre-cut and shipped to Venezuela. On occasions the lumber was purchased in a joint venture with J.P. to save freight costs. Independent Lumber did not change the character of the lumber from the time it left the supplier to the time it was received by the customer. The lumber was taken to a port in Venezuela where the customers purchased the lumber. On February 2, 1981, a cashier's check was issued by Banco de Iberoamerica, S.A., in the *206 amount of $ 55,000 (the "$ 55,000 sum") payable to Independent Lumber. The $ 55,000 sum was deposited into Independent Lumber's savings account. The acquisition of the $ 55,000 sum by Independent Lumber was effectuated through Milian. Through January 31, 1985, the books and records of Independent Lumber reflected $ 55,000 as "Long-Term Liability L/P - Independent Plywood." On its corporate income tax returns for the years ending January 31, 1982, January 31, 1983, January 31, 1984, and January 31, 1985, Independent Lumber reflected a $ 55,000 liability in the category for mortgages, notes, and bonds payable in one year or more. Although Mr. Rodriguez' accountant twice requested documentation corroborating the classification of the $ 55,000 sum as a loan, such documentation was never prepared. Mr. Rodriguez traveled to Ecuador, Venezuela, and Mexico on behalf of Independent Lumber. For various reasons, including tariffs and the devaluation of the Venezuelan Bolivar in 1983, Independent Lumber ceased doing business after January 31, 1985, and Mr. Rodriguez went back to work in a grocery store. The Valdeses
Jorge E. Valdes ("Mr. Valdes") and Maritza Valdes ("Mrs. Valdes") *207 were residents of Miami, Florida at the time they filed their petition in the instant case. Mr. and Mrs. Valdes (the "Valdeses") were married to each other. They were born in Cuba. Mr. Valdes emigrated to the United States on October 27, 1961, and Mrs. Valdes emigrated to the United States in 1962. Mr. Valdes completed high school and approximately one year of college. Mr. Valdes was exposed to construction work after he graduated from high school when he worked during the following summer for an electrical contractor. In 1972, Mr. Valdes started working full time in construction and secured a license in 1974 by taking the state examination. His license became inactive for a period of time because he did not want to pay for the insurance required for a contractor's license. In 1976, Mr. Valdes was hired as a trainee with an insurance company which was acquired by Metropolitan Life Insurance Company. Mr. Valdes became a claims adjuster supervisor at Metropolitan. Mr. Valdes and Mr. Rodriguez became acquainted because Mr. Valdes was a customer of the grocery store owned by Mr. Rodriguez. The Valdeses lived near the grocery store. Mr. Valdes terminated his employment with *208 Metropolitan, on June 30, 1981. Upon terminating his employment with Metropolitan, Mr. Valdes intended to form a business with Mr. Rodriguez for the purpose of constructing houses. I.L. Construction
I.L. Construction, Inc. ("I.L. Construction") had its principal place of business in Miami, Florida, when it filed its petition in the instant case. On January 31, 1981, Mr. Rodriguez signed a contract to purchase eight lots of real estate located on S.W. 135th Avenue in Miami, Florida ("the eight lots"). The total purchase price required by the contract was $ 232,000. Mr. Rodriguez made a $ 10,000 downpayment pursuant to that contract by check payable to Mark S. Schechner, P.A. Trust. Mark S. Schechner ("Mr. Schechner") is an attorney who practices in Miami, Florida, and whose office was located in the same building in which Milian's office was located. The source of the $ 10,000 downpayment was a loan, the proceeds of which were deposited to Mr. Rodriguez' checking account. That loan was secured by a certificate of deposit purchased by Mr. Rodriguez with the proceeds from the sale of his grocery store. On March 26, 1981, I.L. Construction was organized as a corporation *209 under the laws of the State of Florida. The original incorporator, registered agent, and stock subscriber was Milian. Mr. Schechner assisted in the formation of I.L. Construction. On April 10, 1981, the first meeting of incorporators and directors of I.L. Construction was held in Mr. Schechner's office. At that meeting, Milian resigned as a director of the corporation and assigned his stock subscription to Messrs. Rodriguez and Valdes. Mr. Valdes was elected president of I.L. Construction and Mr. Rodriguez was elected secretary and treasurer. Messrs. Rodriguez and Valdes were named directors of the corporation, and each received 25 shares of stock, representing all of the 50 issued and outstanding shares of stock of the corporation. Messrs. Rodriguez and Valdes organized I.L. Construction to develop the eight lots and build houses on them. The closing of the purchase of the eight lots (the "closing") was originally scheduled for May 1, 1981. On that day, the seller was ready, but the closing had to be cancelled because Messrs. Rodriguez and Valdes did not have sufficient funds to complete the closing. Prior to the closing, neither Mr. Rodriguez nor Mr. Valdes made any *210 study of whether or not they would be able to obtain loans from banks for the purpose of constructing houses. By cashier's check issued by Southeast First National Bank of Miami dated May 1, 1981, the sum of $ 172,000 was transferred into Mr. Schechner's trust account. By cashier's check issued by Southeast First National Bank of Miami and dated May 6, 1981, the sum of $ 50,000 was paid to "Jeffrey Mazor as Attorney for Episa S.A.," the seller of the eight lots. The remittur of the funds to purchase the $ 50,000 cashier's check was Milian. (The sums represented by the $ 172,000 cashier's check and the $ 50,000 cashier's check hereinafter will be referred to collectively as the "$ 222,000 sum.") At or before the closing, the contract for the purchase of the eight lots was transferred to I.L. Construction. [5] The payment of the $ 222,000 sum enabled the closing to take place. Messrs. Rodriguez and Valdes agreed that Mr. Valdes, on behalf of I.L. Construction, would perform the duties of general contractor and would have the responsibility of dealing with surveyors *211 and architects. In July 1981, Mr. Valdes approached Raul Alvarez, an architect, for the purpose of designing two homes for I.L. Construction. On January 29, 1982, I.L. Construction purchased a piece of property from Vincent J. and Selma P. Corbisiero for a total purchase price of $ 30,000. I.L. Construction executed a purchase money mortgage in the amount of $ 29,000 which required I.L. Construction to make monthly payments of $ 279.86 from February 28, 1982, until February 28, 1987, at which time the remaining principal balance and unpaid interest would become due and payable. I.L. Construction made those monthly payments and, as of December 31, 1986, had paid down the balance of the mortgage to $ 26,050.48. I.L. Construction reflected the $ 222,000 sum as a mortgage payable on its corporate tax returns and internal financial statements, showing the following balances due at the end of each of the following calendar years: Year
Balance Due
1981
$ 222,000
1982
222,000
1983
222,000
1984
212,600
1985
178,100
1986
178,100
Respondent's investigation of I.L. Construction began in early 1984, and respondent issued a statutory notice of deficiency to *212 I.L. Construction on March 13, 1985. Thus, "repayment" of the $ 222,000 sum commenced after respondent's audit began and repayments ceased after issuance of the statutory notice. When applying for a construction loan from Republic National Bank, I.L. Construction amended its books to represent that the $ 222,000 sum constituted additional paid-in-capital, rather than a mortgage payable. Sincere Investments
On August 13, 1981, Sincere Investments, Inc. ("Sincere Investments") was incorporated under the laws of the State of Florida. Sincere Investments had its principal place of business in Miami, Florida, when it filed its petition in the instant case. The original registered agent, director, and subscriber to the shares of stock in Sincere Investments was Milian. By agreement dated July 31, 1981, Galindo & Sons, Inc., agreed to sell a restaurant business known as the "International Cafe," 7137 West Flagler Street, Miami, Florida, to Maria Hamilton, Trustee and/or assigns, for a total price of $ 140,000. Maria Hamilton was an attorney who was associated with Mr. Schechner. The agreement called for the purchaser to pay $ 60,000 cash at closing, and to execute a purchase *213 money note and security agreement in the amount of $ 80,000, payable in full six months after the August 31, 1981 closing. By agreement dated September 11, 1981, the agreement dated July 31, 1981, was modified, changing, among other things, the total purchase price to $ 175,000. Paragraph 2(b) of the agreement dated September 11, 1981, changed the payment terms to require the purchaser to execute a purchase money note and security agreement in the principal amount of $ 125,000, bearing 10 percent interest per annum, and payable in two installments of $ 62,500 plus accrued interest, the first installment due six months, and the second installment due one year, from date of closing. Paragraph 2(d) of that agreement also stated that "Purchaser shall pay approximately $ 50,000.00 cash at time of closing of which all deposits shall constitute a part thereof." On September 11, 1981, a promissory note was co-signed by Sincere Investments, Mr. Valdes, and Angel Figueras in favor of Luis Galindo and Esther Galindo in the face amount of $ 125,000. The second, fourth, and sixth unnumbered paragraphs of that promissory note required Sincere Investments to provide security to Luis and Esther *214 Galindo for the note. On September 11, 1981, a security agreement granting a security interest in all of the assets used in the business of International Cafe was executed by Sincere Investments in favor of Luis and Esther Galindo. The schedule on page 2 of the security agreement states that there are no other liens, security interests, claims, charges, or encumbrances against the collateral. A document bearing the date September 11, 1981, was prepared and signed by Mr. Valdes, as president, and Angel Figueras, as secretary and treasurer, of Sincere Investments, stating that Sincere Investments owed $ 50,000 (hereinafter referred to as the "$ 50,000 sum") to Cambios. That document was unsecured. The $ 50,000 sum was paid at closing on behalf of Sincere Investments as part of the purchase price of the International Cafe business. On December 9, 1981, a License Investigation was conducted on Sincere Investments by the Florida State Department of Business Regulation Department of Alcoholic Beverages and Tobacco. In order to obtain a beverage license from the State of Florida, it is necessary to prove the source of the money used to purchase the business. Sincere Investments *215 disclosed that it had borrowed the $ 50,000 sum from Cambios. In a document dated February 1, 1982, Sincere Investments agreed to sell the International Cafe restaurant business to International Cafe, Inc. On April 26, 1982, Sincere Investments sold the International Cafe restaurant business to International Cafe, Inc. for $ 175,000. That sale is detailed in a closing statement. In a document dated April 27, 1982, Alfredo Elias was substituted for Sincere Investments in the documents executed in favor of Luis and Esther Galindo. Sincere Investments issued its check, dated June 21, 1982, in the amount of $ 43,755.21 to "C.M.I.S.A.," indicating on the check that its purpose was "repayment of Loan." C.M.I.S.A. is an acronym for Cambios. On June 22, 1982, that check was negotiated into official check number TE301791 issued by Barnett Bank of South Florida, N.A. Sincere Investments made no other payments to "C.M.I.S.A." Milian and Cambios
Cambios was formed in the Republic of Panama on May 31, 1979. On or about November 2, 1981, an Application By Foreign Corporation for Authorization to Transact Business in Florida was prepared by Milian for Cambios. Cambios did not *216 have a business license to operate in Panama. Milian described himself as being Cambios, that the officers of Cambios were just figureheads, and that he decided the nature of the business to be conducted by Cambios. On or about May 4, 1983, Milian was detained by Federal law enforcement officers while having approximately $ 5.4 million in cash in his possession. At that time, Milian was preparing to leave the country in his private plane. Pursuant to alleged consent given by Milian, those law enforcement officers, including special agents in respondent's Criminal Investigation Division, searched Milian's office and personal residence. As a result of that search, the agents seized the files maintained by Milian with respect to 913 individuals. The agents made two copies of each file and provided one complete set to respondent's Examination Division. The Examination Division reviewed the contents of each of these files, which resulted in civil audits of approximately 55 percent of the individuals identified. The names of some of the petitioners in the instant case were among those names in files maintained by Milian. By Superseding Indictment number 83-419-Cr-EBD(s), Milian *217 was indicted in the United States District Court for the Southern District of Florida on 62 counts. Count one of the indictment against Milian charged him with, inter alia, conducting a racketeering activity through Cambios for the purpose of transporting substantial sums of U.S. currency derived from the sale of cocaine. Counts 2 through 48 charged Milian with specific instances of using the facilities of interstate and foreign commerce to distribute the proceeds of an unlawful business enterprise involved in the sale and distribution of controlled substances. Counts 49 through 58 charged Milian with specific instances of failing to file with the Internal Revenue Service a "Currency Transaction Report" on IRS Form 4789 in connection with the receipt, exchange, and transfer of sums of United States currency in excess of $ 10,000.00. Counts 59 and 60 charged Milian with two specific instances of failing to file in the manner required a Report of International Transportation of Currency of Monetary Instruments on Form 4790 in connection with the transportation from the United States of sums of U.S. currency in excess of $ 5,000.00. Count 61 charged Milian with possession of 62 pounds *218 of cocaine with the intent to distribute, and Count 62 charged Milian with possession of counterfeit $ 100 bills with the intent to defraud. Following a jury trial, at which Milian testified in his own defense, he was found guilty on all of the counts set forth in the indictment except the counterfeit charge. Milian also was indicted for aiding and abetting a taxpayer in making false statements on that taxpayer's income tax returns, and for conspiracy to defraud the Internal Revenue Service. Milian pleaded guilty to the indictment charging him with aiding and abetting and conspiracy. At the trial of the instant case, Milian invoked the privilege against self-incrimination under the Fifth Amendment to the United States Constitution (the "Fifth Amendment privilege"), citing his pending appeal of his criminal conviction. Milian was not represented by counsel at the trial of the instant case. The Audit
By letter dated January 5, 1984, respondent first informed the Valdeses of an audit. Shortly thereafter, respondent began examinations of the other petitioners. In early 1984, Mr. Valdes was summoned by agents of the Criminal Investigation Division of the Internal Revenue *219 Service to give testimony and produce the books and records of Sincere Investments and I.L. Construction in his capacity as president of both of these corporations. At that time he invoked the Fifth Amendment privilege. Mr. Valdes did not claim the Fifth Amendment privilege subsequent to the filing of the petitions in the instant case. In early 1984, Mr. Rodriguez was summoned by agents of the Criminal Investigation Division of the Internal Revenue Service to give testimony and produce the books and records of Independent Lumber in his capacity as president of the company. At that time Mr. Rodriguez invoked the Fifth Amendment privilege. Mr. Rodriguez has not claimed the Fifth Amendment privilege since the filing of the petitions in the instant case. Respondent issued statutory notices of deficiency to petitioners on the following dates: Petitioner(s)
Date
I.L. Construction
March 13, 1985
Independent Lumber
April 10, 1985
Valdeses
April 12, 1985
Rodriguezes
May 24, 1985
Sincere Investments
September 11, 1985
OPINION Burden of Going Forward
Respondent determined in the notice of deficiency to the Valdeses that the $ 222,000 sum and the *220 $ 50,000 sum were income to the Valdeses in 1981. Respondent also determined in the notice of deficiency to the Rodriguezes that the $ 222,000 and $ 55,000 sums were income to them in 1981. Respondent determined in the notice of deficiency to Sincere Investments that the $ 50,000 sum was income to it in 1981. In the notice of deficiency to Independent Lumber, respondent determined that the $ 55,000 sum was income to it in 1981. In the notice of deficiency to I.L. Construction, respondent determined that the $ 222,000 sum was income to it in 1981. The $ 222,000 sum, the $ 55,000 sum, and the $ 50,000 sum are collectively referred to hereinafter as the "disputed funds." Petitioners contend that the burden of going forward with the evidence should shift from petitioners, other than the Rodriguezes, [6] to respondent, relying on "a line of cases involving the alleged receipt of unreported [illegal] income where respondent introduces no substantive evidence but rests on the presumption of correctness, while the taxpayer denies the receipt of the income and challenges the notice of deficiency on the grounds that it was arbitrary." Respondent relies on the presumption of correctness *221 of the notices of deficiency. It is well settled that respondent's determinations, as embodied in his statutory notices of deficiency, generally are presumed correct. Welch v. Helvering,290 U.S. 111, 115 (1933). When, however, respondent's determinations are shown to be arbitrary and excessive (e.g., without "factual foundation" or "rational basis"), the presumption evaporates, and the burden of going forward with evidence shifts to respondent. Helvering v. Taylor,293 U.S. 507, 514-515 (1935); De Cavalcante v. Commissioner,620 F.2d 23, 27-28 (3d Cir. 1980), affg. a *222 Memorandum Opinion of this Court; Berkery v. Commissioner,91 T.C. 179, 186 (1988), affd. without published opinion    F.2d    (3d Cir. 1989); Dellacroce v. Commissioner,83 T.C. 269, 280 (1984). When a taxpayer asks this Court to find a statutory notice of deficiency to be arbitrary and excessive, he is asking this Court to look behind that notice. As a general rule, this Court will not honor such a request, even though the determination may have been based upon hearsay or other inadmissible evidence. Berkery v. Commissioner, supra at 186. The underlying rationale for the general rule is that a trial before this Court is a proceeding de novo, and determinations therefore are to be based upon the merits of the case, and not upon the record developed at the administrative level. Berkery v. Commissioner, supra at 186 (citing Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 328 (1974)). We have recognized exceptions to the general rule, however, in cases where there has been substantial *223 evidence of unconstitutional conduct by respondent in determining the deficiency, and in unreported illegal income cases where "respondent introduced no direct or substantive evidence, but rested on the presumption of correctness and the taxpayer challenged the notice of deficiency" on the ground that it was arbitrary. Berkery v. Commissioner, supra at 186-187. Petitioners rely upon the line of cases involving unreported illegal income, e.g., Llorente v. Commissioner,649 F.2d 152 (2d Cir. 1981), affg. in part, revg. in part, and remanding in part 74 T.C. 260 (1980); Carson v. United States,560 F.2d 693 (5th Cir. 1977); Dellacroce v. Commissioner,83 T.C. 269 (1984); Jackson v. Commissioner,73 T.C. 394 (1979); Anastasato v. Commissioner,T.C. Memo. 1985-101, vacated and remanded on other grounds 794 F.2d 884 (3d Cir. 1986). Notwithstanding the cases cited by petitioners, in light of petitioners' admission that the disputed funds were in fact received by the corporate petitioners, petitioners' argument must fail. We addressed the effect of conceded *224 receipt on the issue of who bears the burden of proof in Tokarski v. Commissioner,87 T.C. 74, 76-77 (1986), where we stated: In the instant case, however, there is no question that petitioner received $ 30,000 in 1981. Under these circumstances, we hold that there is no requirement that respondent produce evidence linking petitioner to an income-producing activity as a precondition to requiring petitioner to meet his burden of proof. * * * [Fn. ref. omitted.] Thus, insofar as the disputed funds were paid to the corporate petitioners or represented advances made on their behalf, the corporate petitioners must explain nontaxable sources for the disputed funds in order to prevail. The record discloses that the corporate petitioners conducted business activity. Thus, we have no basis for disregarding them as separate jural entities and treating the individual petitioners as the true recipients of the disputed funds. Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438-439 (1943). [7]
Petitioners also argue that the notices of deficiency are arbitrary because respondent *225 determined the same items of income against more than one of the petitioners. Respondent's position on brief, however, is that "Respondent has never contended, and does not contend herein, that the three amounts should be taxed more than once." Based upon that position and considering that petitioners' cases are consolidated in one proceeding, we do not find respondent's notices of deficiency to be arbitrary. Meyer v. Commissioner,46 T.C. 65, 82-83 (1966), affd. on this issue 383 F.2d 883 (8th Cir. 1967). [8]
Petitioners also argue that the notices are arbitrary because respondent purportedly determined $ 220,000 of income against other individuals (who are not parties to the instant case). In Reynolds v. Commissioner,861 F.2d 469 (6th Cir. 1988), revg. a Memorandum Opinion of this Court, the Sixth Circuit held, in an opinion rendered subsequent to the filing of the briefs in the instant case, that where the Commissioner had entered into a court-approved stipulation binding a taxpayer's wife *226 to pay taxes on certain capital gain in earlier proceedings in bankruptcy court, the Commissioner was judicially estopped in the proceeding in this Court from repudiating the position taken earlier in the bankruptcy court. In the instant case, however, petitioners have not shown that any judicial determination has been made that taxes any of the disputed funds to any other taxpayer who is not a party to the instant case. Thus, the doctrine of judicial estoppel as enunciated in Reynolds could not apply to the facts of the instant case. Moreover, petitioners have not offered any evidence that the purported deficiency determinations of $ 220,000 against other non-party individuals have anything to do with the disputed funds in the instant case. In that petitioners have failed to advance a meritorious argument for shifting the burden of going forward with the evidence to respondent, at least with respect to the corporate petitioners, we hold that the corporate petitioners have the burden of proof and the burden of going forward with the evidence in the instant case. With respect to the Rodriguezes, respondent has the burden of proof because he relies on the six-year period of *227 limitation under section 6501(e) ( Reis v. Commissioner,1 T.C. 9 (1942), affd. 142 F.2d 900 (6th Cir. 1944)) or the unlimited period of limitation under section 6501(c) for fraud (section 7454(a); Rule 142(b)). However, because we hold below that the $ 222,000 sum is taxable income to I.L. Construction, the $ 55,000 sum is taxable to Independent Lumber, and the $ 50,000 sum is a loan to Sincere Investments, the question of whether the Rodriguezes and the Valdeses have the burden of proof is moot. The Deficiencies
We now turn to deciding whether the corporate petitioners have met their burden of proving that the disputed funds are not taxable income. Petitioners contend that the disputed funds represent loans or capital contributions made by Milian and/or Cambios to the respective corporate petitioners that received the funds or on whose behalf the funds were spent. Respondent posits, as an alternative scenario, that the disputed funds represent unreported income of petitioners that petitioners desired to launder through Milian. We hold that petitioners have failed to prove nontaxable sources for the $ 55,000 sum and the $ 222,000 sum. *228 We have found that the $ 55,000 sum was received by Independent Lumber and that the $ 222,000 sum was spent on behalf of I.L. Construction. Those two sums, therefore, are taxable income to Independent Lumber and I.L. Construction, respectively. We also hold that petitioners have proved a nontaxable source for the $ 50,000 sum advanced on behalf of Sincere Investments. Whether the disputed funds represent loans or capital contributions or are taxable income is a question of fact. Beaver v. Commissioner,55 T.C. 85, 91 (1970); Fisher v. Commissioner,54 T.C. 905, 909 (1970). For a disbursement to constitute a true loan, there must have been, at the time the parties entered into the transaction, an unconditional intention on the part of the transferee to repay the money and an unconditional intention on the part of the transferor to secure repayment. Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Haag v. Commissioner,88 T.C. 604 (1987); Haber v. Commissioner,52 T.C. 255, 266 (1969), *229 affd. 422 F.2d 198 (5th Cir. 1970); Saigh v. Commissioner,36 T.C. 395, 420 (1961). Courts have focused on several factors to determine whether a transfer of funds is a true loan. The factors relevant to the instant case include (1) the existence or nonexistence of a debt instrument; (2) provisions for security, interest payments, and a fixed repayment date; (3) whether repayments were made; and (4) whether a third party would have made the loan under the same circumstances. See In re Uneco, Inc.,532 F.2d 1204, 1208 (8th Cir. 1976); In re Indian Lake Estates, Inc.,448 F.2d 574, 578-579 (5th Cir. 1971); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). While those cases concern whether cash advances between closely held corporations and shareholder/employees constitute bona fide loans, as opposed to disguised dividends, compensation, or contributions to capital, we believe the same underlying principles should nonetheless guide our inquiry in the instant case. We are troubled by several aspects of petitioners' story. Petitioners suggest that *230 Mr. Rodriguez decided to sell his grocery store business to spend more time with his family and start a new business of exporting lumber to Venezuela. Mr. Rodriguez, however, had no prior experience in the exporting business. We believe that such a drastic change probably would result in more time away from the family. Notably, the Rodriguezes did not testify that Mr. Rodriguez had any free time for his family after making that change. We are also asked to accept that Independent Lumber received $ 55,000 as a loan from Milian, a convicted money launderer, without executing any note, security instrument, or other evidence of the terms of the transaction. We find it hard to believe that a loan involving such a high degree of risk would be made by an unrelated lender without, at the very least, some written documentation of the terms of the loan. We also are asked to accept petitioners' story that Mr. Valdes quit his employment as an insurance adjuster to go into business with Mr. Rodriguez, a former grocery store owner and casual acquaintance of his. They were to start the business of constructing residences, a business in which neither of them had any experience and that was *231 laden with risk. Again, they turned to Milian who advanced $ 222,000 on behalf of I.L. Construction, a corporation which Mr. Rodriguez and Mr. Valdes owned equally. As with the purported loan of the $ 55,000 sum received by Independent Lumber, the transaction was unaccompanied by any documentation of any of its terms. The facts unfold a pattern of dealing with Milian on a basis that would not be acceptable in a normal commercial setting. Yet, petitioners ask that we accept their story that the $ 222,000 sum and the $ 55,000 sum were loans obtained by I.L. Construction and Independent Lumber in what appeared to petitioners to be a normal commercial setting. Petitioners rely on Williams v. Commissioner,28 T.C. 1000, 1001 (1957), for the proposition that "It is not within our province arbitrarily to disregard the unimpeached and uncontradicted testimony of a taxpayer." Nevertheless, we point out that we are not required to accept petitioners' self-serving testimony as gospel -- we are "free to analyze the surrounding circumstances and to draw reasonable inferences therefrom which would negate [a taxpayer's own evidence of his subjective intent]." Fleischer v. Commissioner,403 F.2d 403, 406 (2d Cir. 1968), *232 affg. a Memorandum Opinion of this Court; Tokarski v. Commissioner,87 T.C. at 77. Petitioners attempt to justify the absence of signed notes for the $ 222,000 sum and the $ 55,000 sum by pointing to the lack of sophistication of Mr. Rodriguez and Mr. Valdes. While we believe that they lacked sophistication in exporting lumber and constructing residences, we do not believe they lacked a general level of financial sophistication. Both of them were knowledgable in general business and financial matters and had previously signed notes and other evidences of indebtedness when they borrowed money from other sources. Moreover, we do not find the sophistication of Mr. Rodriguez and Mr. Valdes relevant to the issue of whether a purportedly independent lender would make a bona fide loan without any documentation of its terms. Petitioners also rely on the "consistent treatment" of the disputed funds as loans on the books of the corporate petitioners as evidence of valid indebtedness. Certainly consistent treatment on a taxpayer's books may be evidence of true indebtedness in normal circumstances. In circumstances such as those involved in the instant case, however, *233 such treatment is little more than a self-serving declaration, absent actual documentation of a loan. Turner v. Commissioner,812 F.2d 650, 654 (11th Cir. 1987), affg. a Memorandum Opinion of this Court. In fact, the $ 222,000 sum was recharacterized on the books of I.L. Construction from a mortgage payable to additional paid-in-capital when it sought construction financing from Republic National Bank. Petitioners also rely on purported repayments by I.L. Construction as evidence of a true loan. We give little weight to those purported repayments because the receipts for the purported repayments were prepared by Milian and, as suggested by respondent, Milian customarily produced whatever documents his customers needed. Moreover, the first purported repayment did not occur until August 14, 1984, after petitioners received notice from respondent that they were going to be audited. The last purported repayment was made on June 26, 1985, just prior to the mailing of the last notices of deficiency involved in the instant case. In other words, it appears that petitioners began the purported repayments when they knew they were going to be audited and then stopped *234 paying once the audits ended. Even though petitioners contend that they believe that they remain liable for repayment of portions of the $ 222,000 sum and the $ 55,000 sum to Milian, they have not continued making repayments. Petitioners have not contended that they are not financially able to repay. It thus appears that petitioners are awaiting the outcome of the instant case to decide whether they in fact owe anyone repayment of the $ 222,000 and/or $ 55,000 sums. We doubt, despite petitioners' self-serving declaration that the disputed funds still remain valid indebtedness, that petitioners intend to or ever will have to repay the $ 222,000 sum and/or the $ 55,000 sum to Milian or Cambios. We therefore give little weight to the purported repayments of those sums. Atlanta Biltmore Hotel Corp. v. Commissioner,349 F.2d 677, 680 (5th Cir. 1965), affg. a Memorandum Opinion of the Court. Relying on Milian's testimony, petitioners suggest that we should find Milian credible. They cite Matut v. Commissioner,88 T.C. 1250 (1987), affd. in part and vacated in part 858 F.2d 683 (11th Cir. 1988), where we found that another convicted *235 felon, Mario Lignarolo, was credible. Nevertheless, we are unwilling to give credence to Milian's testimony in the instant case because he, for the most part, claimed the Fifth Amendment privilege at trial. We find that claim objectionable because Milian testified in his own defense at his criminal trial [9] and would have waived the privilege, at least as to matters covered by his testimony. Rogers v. United States,340 U.S. 367 (1951). Counsel, however, failed to raise an objection to Milian's assertion of the Fifth Amendment privilege on the basis of Milian's testimony in the criminal proceeding. As a result, Milian was not subjected to any rigorous cross examination. We therefore are unwilling to find that Milian was credible in the face of his conviction and guilty plea. In any event, in response to questions to which he did not claim the Fifth Amendment privilege, Milian could recall few details regarding the disputed funds. Petitioners cite our Memorandum Opinion in Rogers v. Commissioner,T.C. Memo. 1986-529, another case involving *236 transactions with Milian, where we upheld the validity of certain disputed loans. In Rogers, however, we found that true indebtedness existed because of several factors, including: (1) sufficient documentation, (2) lack of contradictory evidence and (3) evidence of repayments (while the repayments arose after the commencement of the audit, the repayments were found to be for economic reasons unconnected with the audit). Furthermore, the loans in Rogers were not made by Milian or Cambios -- Milian appeared to be only assisting the taxpayers in completing the transaction (the record in Rogers was devoid of a connection between the taxpayers and Milian). The facts in Rogers are therefore distinguishable from those of the instant case as they relate to the $ 222,000 sum and the $ 55,000 sum. The $ 50,000 sum advanced on behalf of Sincere Investments, however, requires further analysis. The $ 50,000 sum was documented as a loan, it appears to have been repaid almost entirely to Cambios[10] prior to the commencement of any audit, and no contradictory evidence appears in the record. The preponderance of the evidence in the record thus tips the scale enough to give the *237 "nod" [11] to petitioners with respect to the $ 50,000 sum. We therefore hold, on the basis of the factors in Rogers, that petitioners have proved that the $ 50,000 was a loan to Sincere Investments. In the event we fail to find that the disputed funds were loans, petitioners alternatively ask that we find the disputed funds to be contributions to capital of the corporate petitioners by Milian and/or Cambios, based on our opinion in Sullivan v. Commissioner,T.C. Memo. 1985-217. In Sullivan we held that funds provided to the taxpayer to purchase a boat were a contribution to equity. In Sullivan we found that the provider of the funds used the boat on several occasions. In the instant case, however, there is no evidence that Milian or Cambios *238 obtained any equity interest in Independent Lumber or I.L. Construction or obtained the use of their assets in exchange for the $ 55,000 sum or the $ 222,000 sum, a significant factor distinguishing Sullivan.
We have considered the parties' remaining arguments with respect to the foregoing issues and find them to lack merit. Our holding that the $ 55,000 sum is taxable to Independent Lumber, the $ 222,000 sum is taxable to I.L. Construction, and the $ 50,000 sum is a loan to Sincere Investments, coupled with respondent's position that he does not seek to tax the disputed funds but once, obviates the need to decide the remaining issues. To reflect the foregoing, Decisions will be entered as follows: Docket No. 12765-85 for the respondent without the fraud addition to tax under section 6653(b); Docket No. 12766-85 under Rule 155; Docket No. 15860-85 for the petitioners; Docket No. 29055-85 for the petitioners; Docket No. 41424-85 for the petitioner.
Footnotes
1. Cases of the following petitioners are consolidated herewith: I.L. Construction, Inc., docket No. 12765-85; Independent Lumber and Plywood Corporation, docket No. 12766-85; Jorge E. Valdes and Maritza Valdes, docket No. 15860-85; Ezequiel N. Rodriguez and Maria Rodriguez, docket No. 29055-85; and Sincere Investments, Inc., docket No. 41424-85. For convenience, except where otherwise noted, the foregoing cases hereinafter will be referred to collectively as "the instant case."↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedur.↩
*. plus 50 percent of the interest due on $ 13,581 under section 6653(b)(2). ** plus 50 percent of the interest due on $ 62,228 under section 6653(a)(2)↩. ***. plus 50 percent of the interest due on $ 14,944 under section 6653(b)(2)↩.
3. Respondent stipulated that the fraud additions determined against Ezequiel N. and Maria Rodriguez for taxable year 1982 and Independent Lumber and Plywood Corporation for taxable year ended January 31, 1983, do not apply. Further, respondent has not argued on brief that the remaining fraud additions determined against the corporate petitioners apply, and we therefor consider those fraud additions conceded. See Rule 142(b).↩
4. Milian's money laundering activities and his relationship with Cambios are described in more detail hereinafter under the heading "Milian and Cambios."↩
5. The closing took place in the name of I.L. Construction, which executed the closing statement as the buyer.↩
6. Petitioners do not assert that the burden of going forward shifts to respondent with respect to the Rodriguezes "because the statute of limitations bars the assessment of deficiencies against them in the absence of respondent carrying his burden of proof with regard to fraud or an omission of income in excess of 25 percent. Therefore, as to Mr. and Mrs. Rodriguez, respondent already has the burden of proof in order to prevail in the assertion of deficiencies."↩
7. Haeri v. Commissioner,T.C. Memo. 1989-20↩.
8. See Puppe v. Commissioner,T.C. Memo. 1988-311; Peterson v. Commissioner,T.C. Memo. 1987-356↩.
9. See United States v. Milian-Rodriguez,828 F.2d 679, 680↩ (11th Cir. 1987).
10. We note our finding that the check made payable to "C.M.I.S.A." represented payment to Cambios.↩
11. Faist v. Commissioner,T.C. Memo. 1980-354↩, where this Court declined to find any negative scale-tipping inference from the taxpayer's failure to document a loan, but the circumstances involved a borrower who was the sole shareholder of the creditor and the issue was loan versus dividend.